## STATE OF CONNECTICUT *v.* CHASITY WEST
### (SC 16627)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 19, 2004—officially released July 26, 2005

*Hope C. Seeley*, with whom, on the brief, were *Hubert J. Santos*, *Sandra L. Snaden* and *Patrick S. Bristol*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Sandra Tullius*, senior assistant state's attorney, and *Rosita M. Creamer*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. In the early morning hours of July 9, 1998, seven year old Jarrell Cuyler and his two year old sister, Lindsey Cuyler, were asleep in their home on Lovell Avenue in Windsor, where they resided with their mother, Tammi Cuyler, when they were viciously attacked by a masked intruder. Although seriously injured, Lindsey survived her wounds; tragically, Jarrell did not. A week later, the defendant, Chasity West, who is Tammi Cuyler's first cousin, was charged with various crimes in connection with the attack. At the ensuing jury trial, the state adduced powerful evidence of the defendant's guilt, including a motive that is almost as unfathomable as the crimes themselves: the defendant thought that by killing Jarrell and Lindsey, their father,

Arnold Cuyler, with whom the defendant was romantically involved, finally might agree to marry the defendant and move out of state with her. At the conclusion of the trial, the jury found the defendant guilty of capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (9),[1] murder in violation of General Statutes § 53a-54a (a), criminal attempt to commit murder in violation of General Statutes §§ 53a-49 (a) and 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, two counts of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (1), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and (2). The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective term of life imprisonment without the possibility of release, plus seventy years.[2]

---

[1] General Statutes (Rev. to 1997) § 53a-54b (9) provides that the murder of a person under the age of sixteen shall be a capital felony. We note that § 53a-54b has since been amended, and what was subdivision (9) in the 1997 revision of § 53a-54b is now subdivision (8). See General Statutes § 53a-54b (8).

[2] After the jury found the defendant guilty of capital felony, the state sought the imposition of the death penalty, and, accordingly, the court thereafter conducted a separate penalty phase hearing. See generally General Statutes (Rev. to 1997) § 53a-46a. Following that hearing, the jury found that the state had proved the existence of an aggravating factor beyond a reasonable doubt, namely, that the defendant had committed the capital felony and "in such commission knowingly created a grave risk of death to another person in addition to the victim of the [capital felony]." General Statutes (Rev. to 1997) § 53a-46a (i) (3). The jury also found that the defendant had proved the existence of one or more mitigating factors by a preponderance of the evidence. See General Statutes (Rev. to 1997) § 53a-46a (d). Upon weighing the aggravating factor and the mitigating factor or factors, the jury further found that the aggravating factor did not outweigh the mitigating factor or factors. See General Statutes (Rev. to 1997) § 53a-46a (e). Accordingly, the trial court sentenced the defendant to life imprisonment without the possibility of release on the capital felony count. See General Statutes (Rev. to 1997) § 53a-46a (g).

On appeal,[3] the defendant claims that the trial court improperly: (1) precluded her from introducing evidence of unidentified finger and palm prints that were recovered from the crime scene; (2) permitted the state to introduce expert testimony regarding microscopic hair analysis; (3) precluded her from introducing certain evidence to impeach the state's key witness; (4) denied the defendant's motion for a mistrial based on certain juror misconduct and failed to conduct an adequate hearing with respect to certain other juror misconduct; and (5) instructed the jury concerning the parties' failure to call two prospective witnesses. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In July, 1998, the defendant, a twenty-three year old licensed practical nurse employed at the Cheshire correctional institution, had been involved romantically for almost three years with Arnold Cuyler, Tammi Cuyler's former husband. Their relationship began shortly after Lindsey's birth, in August, 1995, while Arnold and Tammi still were married, and at a time when the defendant, who was approximately seven years younger than Tammi, regularly babysat for Jarrell and Lindsey. Tammi and Arnold separated in the fall of 1995 and divorced in March, 1996. Under the terms of the divorce decree, Arnold, who resided in an apartment in Bristol, had visitation with Jarrell and Lindsey every other weekend and two nights a week. Often, on his scheduled weeknight visits, Arnold would pick up Jarrell from daycare and Lindsey from the babysitter's home, and take them to Tammi's house, where he would care for them until she returned from work. Tammi kept a key to the house in Lindsey's diaper bag with which Arnold could let himself in on those days.

---

[3] The defendant appealed directly to this court in accordance with General Statutes § 51-199 (b) (3).

The defendant, who resided with her parents in Windsor, felt deeply threatened by Arnold's continued relationship with Tammi, so much so that, unbeknownst to Arnold, she often followed him to Tammi's house on the days that he took Jarrell and Lindsey there. The defendant would park her car down the street to make sure that Arnold was not "getting too comfortable . . . ." She referred to these excursions as "[m]issions . . . ." Sometimes, the defendant's teenaged cousins, India Riley and Amber Riley, would go with her, and she would ask them to describe the inside layout of Tammi's house. The defendant also periodically asked Arnold questions about the location of the rooms in Tammi's house. Tammi had purchased the house in August, 1997, after her divorce from Arnold, but, because of the tension between her and the defendant, Tammi never invited the defendant into her house. Indeed, by that time, the defendant's relationship with Arnold had caused tension not only between the defendant and Tammi, but also between the defendant and other members of their large, religious family, many of whom were aware of the defendant's relationship with Arnold and disapproved of it.

Despite her family's disapproval, the defendant desperately wanted to marry Arnold and move out of state with him. Whenever she broached the subject with him, however, he told her that he could never marry her because she was Tammi's cousin and because of the tension in her family. He also told her that he would never move out of state because his children were too important to him to leave them. The defendant grew increasingly angry over Arnold's refusal to marry her and resentful of Jarrell, Lindsey and Tammi, whom she viewed as obstacles to the life that she envisioned for herself with Arnold. Among other things, the defendant was upset about how much money Arnold paid Tammi for child support. Over time, the defendant grew to hate

Tammi even though Tammi never harmed the defendant in any way.

The tension in the family escalated in 1998 when Tammi initiated an investigation by the elders of her church into whether Arnold had committed adultery with the defendant while Tammi and Arnold were married. This infuriated the defendant who, around this time, began to plot ways to harm Tammi. In particular, in April or May, 1998, the defendant telephoned Alexis Grajales, the eighteen year old boyfriend of her cousin, India Riley, to tell him about a job opening at the University of Connecticut Health Center. During that conversation, however, the defendant also asked Grajales if he knew anyone who had any knowledge about explosives. He told her no. The defendant called Grajales a number of times over the next several weeks with similar inquiries, among them whether he knew where she could get a gun and whether he knew anyone who would kill someone for money. According to Grajales, the defendant told him that Tammi had been terrorizing her for years and that the defendant needed to "deal" with her. She also told him, however, that, although she wanted to deal with Tammi in some way, she did not want to kill her because, in that event, she would have to take care of Tammi's children.

In late May, 1998, the defendant solicited Grajales' involvement in a plan that the defendant had devised to vandalize Tammi's home. Specifically, the defendant offered to pay Grajales $4000 if he would enter Tammi's home with the defendant and restrain Tammi while the defendant vandalized the home. Grajales agreed. His understanding "was that it was going to be some . . . vandalism to scare Tammi, nothing else, [just] mess up the house . . . ."[4] In furtherance of the plan, on June 7,

---

[4] The defendant testified at trial in her own defense. In her testimony, she acknowledged that she had given Grajales $3400 on July 6, 1998, two days before the burglary and the attack. The defendant claimed, however, that she had given Grajales the money to help him make a down payment

1998, the defendant and Grajales went to a department store in East Hartford and purchased a flashlight and two pairs of navy blue coveralls for use in the burglary. Several days later, on June 11, the defendant asked her cousin, Amber Riley, to go with her to their grandmother's house to see if Tammi's house key was in Lindsey's diaper bag.[5] The defendant later told Grajales that she was able to get the key from the bag and make a copy of it.

The defendant and Grajales originally planned to vandalize Tammi's house on July 7, 1998. That evening, however, the defendant called Grajales and told him that she was with Arnold and could not leave.[6] While she had Grajales on the telephone, she asked him to buy a "rug cutter . . . with a button that lets the blade adjust." Grajales later went out and purchased such a cutter.[7]

The following evening, July 8, the defendant and Grajales spoke on the telephone, and the defendant advised Grajales that they could go forward with their plan that night. She further indicated that she would contact Grajales when he was to leave his house to meet her.

That same evening, the defendant arrived at Arnold's apartment in Bristol at approximately 8 p.m. After spending the evening there, the defendant left at

on a car and to purchase an engagement ring. The defendant also testified that when she gave him the money, she told him, "if [he] really could get [Tammi] to cut the 'BS,' [he could] . . . keep all of [the money]."

[5] In her trial testimony, the defendant admitted to stealing the key to Tammi's house from Lindsey's diaper bag and making a copy of it.

[6] In fact, the defendant was not with Arnold on the evening of July 7, 1998, as she told Grajales. Rather, that evening, Lindsey spent an unscheduled overnight visit with Arnold at his apartment. Jarrell also spent the night away from home, at his grandmother's house. At trial, the state maintained that the defendant had changed her plans only after learning from Arnold that Lindsey and Jarrell would not be at home that evening.

[7] It appears that the cutter that Grajales had purchased was a type of box cutter.

approximately 12:30 a.m. Between 12:30 a.m. and 1:10 a.m., the defendant called Grajales six times on her cellular telephone while driving from Bristol to Windsor to meet him. During one of the calls, she told him not to forget the coveralls, the cutter and the flashlight. She also told him to bring an empty container, such as a soda bottle. The defendant assured Grajales that Lindsey and Jarrell would not be at home because they were spending the night with their grandmother.

Grajales met the defendant at a shopping plaza in Windsor, as planned.[8] They then proceeded in separate cars to a nearby service station where Grajales produced a two liter soda bottle that they filled with gasoline.[9] Because the bottle had no cap, they placed a cookie wrapper in the opening of the bottle to keep the gasoline from spilling. A video surveillance camera captured the defendant shortly before 2 a.m. as she entered the service station office to pay for the gasoline.[10] Upon leaving the station, Grajales followed the defendant to the parking lot of an apartment complex that was within walking distance of Tammi's house.[11]

---

[8] The defendant and Grajales had taken a ride to the shopping plaza a few days earlier in order to familiarize themselves with it as a meeting place.

[9] The defendant previously had raised the prospect of setting one of Tammi's rooms on fire, and Grajales presumed that that was why the defendant had wanted to fill the soda bottle with gasoline.

[10] At trial, the defendant admitted meeting Grajales at the service station in the early morning hours of July 9, 1998. She claimed, however, that she did not go with him to Tammi's house. Rather, the defendant testified that, after Grajales left, she remained at the service station for a while before going home, listening to the radio and cleaning the backseat of her car. She also testified that Grajales had assured her that he was only going to pull a "prank" at Tammi's house, "just to aggravate her and shake her up a little bit." The plan, according to the defendant, was for Grajales to sneak into the house and leave the gasoline bottle so that, when Tammi woke up, she would know that someone had been there and would be scared. The defendant testified that the prank was worth $3400 to her because she disliked Tammi so much.

[11] At the time of his arrest, Grajales told police that, while driving to the apartment complex near Tammi's house, he saw "a police cruiser behind [them] and saw [it] drive past [them as he and the defendant] pulled into

There, the defendant changed into one of the navy blue coveralls and made two masks from a pair of nylon stockings.[12] She also put on a pair of latex gloves from a box that she had in her car and gave Grajales a pair to wear. They then drove in the defendant's car a short distance to Tammi's house and proceeded to the front door. The defendant was carrying the soda bottle filled with gasoline. Using the duplicate key that she made from the key that she had taken from Lindsey's diaper bag, the defendant opened the front door to Tammi's small, two-story residence and, along with Grajales, entered the residence.

At that time, Lindsey and Jarrell were sleeping with Tammi in her bed in her first floor bedroom.[13] Their baby cousin, Daniel Henderson, who was residing there, also was asleep in a crib in Tammi's bedroom. Tammi was awakened by a noise from the front of the house and got up to investigate. As she approached the front door, she observed two people standing in the foyer, dressed in identical, navy blue clothing and wearing

the parking lot . . . ." As fate would have it, the police officer following Grajales' car ran a check on the license plate and was informed by the Windsor police department dispatcher that the car was registered to a residence in East Hartford. At trial, the officer testified that he saw a car directly in front of Grajales' vehicle and that both of the cars turned into the apartment complex.

[12] The police never recovered the coveralls but found a receipt for them in the defendant's bedroom during a search of her parents' home, where she resided. At trial, the defendant admitted purchasing the coveralls but claimed that she had purchased them for her two brothers as an inducement for them to clean their parents' backyard. The defendant testified, however, that when she got home from the department store where she purchased the coveralls, she realized that they would not fit either one of her brothers. She further testified that, before she could return them to the store, they were destroyed by pool chemicals in the trunk of her mother's car and discarded. The defendant's mother and brother corroborated the defendant's testimony about the coveralls.

[13] Although Jarrell and Lindsey had separate bedrooms on the second floor of Tammi's house, it was not uncommon for them to sleep with Tammi in her bedroom, which was located on the first floor.

nylon stocking masks over their heads. Tammi turned to run, but Grajales overtook her, tackled her and pinned her, facedown, to the floor. Placing a hand over her mouth, Grajales told Tammi to be quiet and that no one would get hurt.[14]

The defendant, meanwhile, headed straight to Jarrell's and Lindsey's bedrooms on the second floor. Finding them unoccupied, she immediately returned to the first floor, entered Tammi's bedroom and closed the door. Shortly thereafter, Tammi heard Lindsey whimpering and Jarrell ask, "What are you doing?" Upon hearing their voices, Tammi desperately tried to free herself from Grajales' hold; in doing so, Tammi managed to pull off one of the gloves that he was wearing and his wristwatch. At some point during the struggle, Grajales removed his hand from Tammi's mouth long enough to hear her plead with him not to hurt her children. Realizing then that the children were at home, and not at their grandmother's house, as the defendant had assured him they would be, Grajales immediately released Tammi, yelled to the defendant that he was leaving and ran from the house. The defendant followed a few moments later, leaving the gasoline-filled soda bottle on a night stand in Tammi's bedroom.[15]

A scene of unimaginable horror awaited Tammi in her bedroom. Lindsey was standing just inside the door

[14] Tammi testified that she had assumed, and later had told the police, that the other intruder also was a male, although she never actually had heard that intruder's voice. According to Tammi, however, she noticed that, in addition to being shorter than the man who had held her down, the other intruder's hair was puffier under his or her mask than the taller of the two intruders.

[15] Grajales made his way on foot back to the apartment complex, where he retrieved his car and drove home to East Hartford. Upon his arrival, he received a telephone call from the defendant, who asked him if he would get rid of her coveralls for her. He refused. The defendant's cellular telephone records indicate that she called Grajales three times between 2:45 a.m. and 2:50 a.m.

with blood pouring from a wound above her wrist. Tammi picked her up and ran upstairs to get a towel for the bleeding.[16] Upon returning to the bedroom, Tammi called to Jarrell who, at first, appeared to be sleeping. When he did not respond, Tammi reached for him, turned him over and observed a deep gash in his neck. Tammi then dialed 911 and pleaded with the operator to send help, explaining that two men had broken into her house and had attacked her children. Tammi told the operator that she feared that her son was dead, and that "they had almost cut his head off." The first ambulance arrived at the scene at 2:39 a.m. and transported Jarrell to Hartford Hospital, where he was pronounced dead at 2:58 a.m. In addition to the laceration on his neck, Jarrell also had lacerations on his left and right forearms, immediately above his wrists.[17] Tammi's infant nephew, Daniel Henderson, was not harmed.[18]

The police interviewed the defendant on the day of the murder. She told them that she had been at Arnold's apartment in Bristol the night before, but had driven home to her parent's house at approximately 1 a.m. and had not made any stops along the way. In her statement, she said that her relationship with Arnold was not seri-

[16] Lindsey's throat also was cut, but the wound was not life threatening. The laceration to her forearm, however, severed a nerve and an artery, and required extensive surgery. She was hospitalized for approximately one week.

[17] According to the autopsy report, Jarrell's neck was cut by a sharp instrument that severed his trachea and partially severed one of his jugular veins and his esophagus. The autopsy also revealed a compression of the neck caused by some kind of ligature. The medical examiner determined that the cause of death was a combination of strangulation and sharp force trauma to the neck. The defendant most likely strangled Jarrell with the cord from the base unit of the cordless telephone located in Tammi's bedroom. The cord, which was found by police draped over the pillow of Tammi's bed, had not been there when Tammi and the children went to bed.

[18] At trial, the state argued that only someone familiar with the family would have known that Daniel was not one of Tammi's children, thereby explaining why he was the only one of the three children who was not harmed.

ous and that there was not much animosity between her and Tammi.

When television news reports of the murder featured a photograph of the wristwatch that Tammi had pulled off of one of her assailants, both Grajales and the defendant became concerned that someone might connect Grajales to the watch, or that it might contain traces of his DNA. They also were worried that the soda bottle that they had left at the house might connect one or both of them to the crime scene. The defendant asked Grajales to return the money that she had given him, which he did, so that her bank account would not arouse suspicion. She also told Grajales that, if the police questioned him about the watch, he should tell them that, on the night of the murder, he had stopped to help a man whose car had run out of gas and that, after getting gasoline for the man, Grajales sold him his watch.

On July 16, 1998, Grajales went to the Windsor police station with counsel to answer certain questions that the police had for him. Grajales told the police that, at approximately 1:45 a.m. on the night of the murder, he was driving home to East Hartford from Windsor when he was flagged down by a man whose car had run out of gas. He told the police that, at the man's request, he went to a nearby service station to purchase gasoline and, while at the station, he ran into the defendant. He further explained that, after he had filled an empty soda bottle with gasoline, the defendant gave him a cookie wrapper to put in the opening of the bottle to keep the gas from spilling. Consistent with the story that the defendant had concocted, Grajales also told the police that when he returned with the gasoline, the man bought his watch from him for $150.

After hearing Grajales' story, the police suspected that the defendant had not been truthful with them and requested another interview with her. The defendant

arrived at the police station at approximately 12:20 a.m. on July 17, 1998, where she was interviewed by Detective James McGlynn of the Connecticut state police and Sergeant Mark Francis of the Windsor police department. They asked the defendant to recount everything that she had done on July 8 and July 9, 1998. From the start of the interview, the defendant was evasive and repeatedly changed her answers.[19] Finally, Francis showed the defendant three photographs of Jarrell that were taken at the time of his autopsy and told her that he did not believe that she was telling the truth. He also stated that it was time for her to do so. He then asked her, "Who killed Jarrell?" The defendant replied, "I did." The defendant then placed her face in her hands and stated, "What have I done?"[20]

After confessing to the murder, the defendant sobbed and stared vacantly at the wall. When McGlynn asked the defendant whether she needed anything, she replied, "Just shoot me. I do not want to go to jail."

[19] For example, the defendant initially told the investigating officers that she had gone directly home upon leaving Arnold's house in Bristol in the early morning hours of July 9, 1998. They then asked her if she had stopped anywhere along the way. After a long pause, the defendant told them that she had stopped at a fast-food restaurant, but that she did not stay there because the line was too long. They then asked her if she had made any other stops, and she replied that she had driven to another restaurant, but that, after getting to the parking lot of the restaurant, she decided that she did not want anything to eat and drove directly home. When asked if she had stopped for gasoline, the defendant paused and said that she had. She also indicated that she had not met anyone she knew at the service station. When pressed, however, she acknowledged that she had run into Grajales there. She then proceeded to tell them a story identical to the story that Grajales had told them about the stranded motorist, the gasoline and the cookie wrapper.

[20] At trial, the defendant denied that she had confessed to murdering Jarrell. She testified, rather, that, at a certain point in the interview, McGlynn left the room, and, while he was gone, Francis said to her, "[Y]ou killed Jarrell." The defendant testified that she had replied, in the form of a question, "I did?" The defendant further testified that Francis then said to her, "I could take that as a confession if I wanted to," and that she had responded, "[C]onfession? . . . I didn't confess to anything."

McGlynn then left the room to get the defendant a glass of water and a tissue. While in the hallway, McGlynn consulted with a superior officer, and they decided that the defendant should be advised of her *Miranda*[21] rights. McGlynn returned to the interview room and read the defendant those rights from a form used by the Windsor police department. When McGlynn had finished reading the defendant her rights, the defendant indicated that she understood them and initialed the form.[22] Then, experiencing a change of heart, the defendant informed the officers that she "didn't confess to anything" and that she "wanted an attorney." She also told them that she was "sorry."

On July 23, 1998, the police searched the defendant's vehicle.[23] During the search, the police observed a blood-like substance on the front top portion of the windshield wiper control lever. The police removed the lever and sent it to the state police forensic laboratory, where DNA testing confirmed to a reasonable degree of scientific certainty that the substance was Jarrell's blood.[24]

---

[21] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[22] At trial, the defendant testified that she did not initial the notice of rights form voluntarily. She explained, rather, that one of the officers had put a pen in her hand, placed his hand over hers, and forced her to write her initials on the form.

[23] Although the police already had searched the defendant's vehicle following the attack, that search had been conducted prior to the defendant's confession.

[24] The defense offered two possible innocent explanations for the presence of Jarrell's blood on the windshield wiper control lever of the defendant's car. First, Paul West, Jr., one of the defendant's brothers, testified that, on the morning of Jarrell's murder, he went to Hartford Hospital with his mother and sisters and that, while he was there, he touched Jarrell's wounds. He further testified that, after doing so, he drove the defendant's car home. As a possible alternative explanation, Paul West, Jr., testified that he had helped clean Tammi's house after the police had finished processing the crime scene, and that he may have gotten some of Jarrell's blood on him while he was cleaning. He further testified that he drove the defendant's car home when he left the house, and that any blood that he may have picked up while cleaning may have been transferred to the windshield wiper control lever at that time.

Grajales entered into a plea agreement with the state on July 27, 1998. Under the terms of that agreement, the state agreed to recommend a total effective sentence of not more than twenty-five years imprisonment in exchange for his guilty pleas to the crimes of felony murder, burglary in the first degree and kidnapping in the first degree, and his cooperation and truthful testimony. In accordance with the agreement, Grajales testified about his role and the defendant's role in the offenses. The defendant sought to demonstrate to the jury that Grajales was lying to protect an unidentified friend, and that that friend, and not the defendant, had accompanied Grajales during the attack.

The defendant testified in her own defense. Although she admitted that she had conceived the plan to burglarize Tammi's house, she insisted that she personally had not entered the house but, rather, that Grajales had done so. The defendant also testified that the purpose of the burglary was only to scare Tammi, and that she never had intended for any physical harm to befall anyone. In support of her claim that she personally had not entered the house, the defendant adduced alibi testimony from her mother, her brother and her sister, all of whom explained that the defendant had come home sometime between 2 and 2:30 a.m. on the night of the offenses and then went back out to pick up food for the family at an all night diner in East Hartford.[25] The

---

[25] The defense also sought to explain certain cellular telephone calls that the defendant had made. The state established that the defendant had placed thirty-seven such calls to Grajales' residence in the month leading up to the attack. Between 12:30 a.m. and 3:07 a.m. on the morning of the attack, the defendant made thirteen calls on her cellular telephone, nine of which were to Grajales' residence. At 1:23 a.m., the defendant called her family's residence. At trial, the defendant's mother testified that, during that call, she had asked the defendant to bring home some food. Between 1:23 a.m. and 2:39 a.m., however, not a single call was placed on the defendant's cellular telephone. In support of its case against the defendant, the state underscored the fact that this lull in the defendant's cellular telephone use corresponded precisely to the period of time that the defendant was with Grajales, first at the gas station and then at Tammi's house. Moreover, at

defendant's family members further testified that the defendant had returned home with the food shortly after 3 a.m. On the basis of their testimony, the defendant maintained that she could not have been in Tammi's house between 2 a.m. and 2:30 a.m., when the offenses were committed. Additional facts and procedural history will be set forth as needed.

I

The defendant first claims that the trial court improperly precluded her from introducing evidence of certain unidentified latent finger and palm prints that had been recovered from the upstairs bathroom door of Tammi Cuyler's home and from the master bedroom doorjamb of that home in violation of her constitutional right to present a defense as guaranteed by the sixth and fourteenth amendments to the United States constitution.[26] The defendant contends that she constitutionally

2:39 a.m., just as the first ambulance was arriving at Tammi's house, activity on the defendant's cellular telephone resumed, first with a call to the defendant's family's residence, followed by three successive calls to Grajales' residence. All four calls were placed from a location somewhere between Windsor and East Hartford, where Grajales resided and where he went immediately upon leaving Tammi's house in Windsor. See footnote 15 of this opinion. The defendant testified that the 2:39 a.m. call to her home was made while she was driving to an all night diner in East Hartford, where she claimed that she had gone to buy food for her family. The purpose of the call, according to the defendant, was to find out whether anyone in her family wanted soda.

[26] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to have compulsory process for obtaining witnesses in his favor . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

"A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment and the due process clauses of the fifth and fourteenth amendments. See, e.g., *Crane* v. *Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986). Furthermore, the sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403,

was entitled to present any evidence that might have cast doubt on whether she was the second intruder who had accompanied Grajales into Tammi's house, as the state claimed, and that the excluded finger and palm print evidence constituted such evidence. We reject the defendant's assertion that the trial court improperly precluded her from introducing that evidence.[27]

The following additional facts are necessary to our resolution of the defendant's claim. The state elicited testimony from Christopher Sudock, a detective with the Connecticut state police major crime unit, who was responsible for collecting and packaging the crime scene evidence. Sudock testified that the police had recovered from the night stand in the first floor bedroom a two liter soda bottle containing a "yellowish, clear liquid" that was capped with a blue wrapper. On cross-examination, Sudock explained that the soda bottle had been sent to the state police forensic laboratory for fingerprint analysis. Sudock further testified on cross-examination that the police also had seized a section of a door jamb from the first floor bedroom that contained an unidentified partial latent palm print. The defendant thereafter sought to introduce the door jamb into evidence, along with a section of the second floor bathroom door that contained two unidentified latent finger prints. The defendant maintained that the unidentified palm and finger prints, which did not match either the defendant's prints or Grajales' prints, were central

85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (right to confrontation); see *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to compulsory process)." *State* v. *Wright*, 273 Conn. 418, 423–24 n.5, 870 A.2d 1039 (2005).

[27] The defendant also claims that her right to present a defense under article first, § 8, of the Connecticut constitution was violated. Because the defendant has not provided a separate analysis of her state constitutional claim, however, we limit our consideration to the defendant's federal constitutional claim. E.g., *State* v. *Turner*, 252 Conn. 714, 718 n.4, 751 A.2d 372 (2000).

to her defense because they tended to support her theory that some unidentified person had accompanied Grajales into Tammi's home at the time of the offenses. The trial court sustained the state's objection to the introduction of the prints, concluding that the evidence lacked relevance because the defendant had made no showing concerning the circumstances under which the prints had been made, including the time frame in which they were made.

During the defendant's case-in-chief, defense counsel called Christopher Grice, a fingerprint examiner, as a witness. Grice testified that he had lifted a partial latent print off the gasoline-filled soda bottle that had been found on the night stand of the first floor bedroom. Grice also testified that that latent print did not match prints of the defendant, Grajales, Tammi or Jarrell. Grice further explained that he did not identify any latent prints at the crime scene that matched the defendant's prints.

We begin our analysis of the defendant's claim by setting forth the applicable legal principles. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Citation omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002). "When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to

deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 668, 735 A.2d 267 (1999).

"We have recognized consistently that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime . . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, supra, 260 Conn. 262–63.

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." *State* v. *Boles*, 223 Conn. 535, 549, 613 A.2d 770 (1992). Relevant evidence is "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable that it would be without the evidence." Conn. Code Evid. § 4-1. We previously have stated that "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation

marks omitted.) *State* v. *Saunders*, 267 Conn. 363, 383, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004). Finally, "[t]he trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Francis*, 267 Conn. 162, 174, 836 A.2d 1191 (2003).

The defendant contends that the unidentified palm and finger print evidence was relevant, and therefore admissible, because that evidence established that a person or persons other than the defendant were present in those areas of Tammi's home where the intruder had gone after entering that home, namely, the second floor and the first floor master bedroom. Although the existence of the unidentified latent prints does establish that another person or persons were in the second floor bathroom doorway and in the doorway of the first floor master bedroom, that showing alone is insufficient to render the evidence admissible. First, there is nothing in the record to indicate when the prints were made; for all that appears, the prints were made weeks, months or even years before the commission of the offenses that are the subject of this appeal.[28] Second, there is nothing in the record linking the prints to any particular individual or individuals, or to any class of individuals. Consequently, the determination of whether the prints were left by a houseguest or other invitee, on the one hand, or by an unidentified perpetrator, on the other, necessarily would require impermissible speculation.

Although, in some cases, the location of such evidence at a particular crime scene will give rise to a

---

[28] We note that, although Tammi purchased her home approximately one year prior to the attack, the record does not indicate when the home was built. A photograph of the home, however, was introduced into evidence at trial as a full exhibit, and it is clear from a review of that photograph that the home is at least twenty-five years old.

reasonable inference that the evidence was left at the scene by a perpetrator of the crime, such as when the relationship between the evidence and crime scene is close and direct; see, e.g., *State* v. *Cerreta*, supra, 260 Conn. 263 (evidence of unidentified hair and fingerprints recovered from murder victim's body, from ligatures used to bind victim's hands and feet, and from personal effects on and around victim's body was relevant to establish that someone other than defendant murdered victim); that is not the case here. In the present case, the prints were located at the periphery of the crime scene, where, as we have explained, they may have been left by any number of invitees long before the commission of the crimes. Because the nexus between the prints and the crime scene is so attenuated, and because there are so many likely explanations for the prints aside from the mere possibility that they were left by an unidentified perpetrator, the evidence of the prints is lacking in probative value.[29] We therefore agree with the state that the trial court properly excluded the unidentified latent prints lifted from the second floor bathroom door and the first floor bedroom doorjamb as too conjectural to have aided the jury in determining whether the defendant or some other unidentified person had accompanied Grajales into Tammi's home.

## II

The defendant next claims that the trial court improperly permitted the state to present expert testimony regarding microscopic hair analysis. We reject the defendant's claim.

The following additional facts and procedural history are relevant to our determination of the defendant's

[29] By contrast, evidence of the unidentified print lifted from the gasoline-filled soda bottle—an instrumentality of the crime that undisputedly had been carried into the house by a participant in the criminal scheme—bore a sufficiently real and direct relationship to the crime to warrant its admissibility.

claim. Prior to trial, the defendant filed a motion in limine to exclude all expert testimony regarding microscopic hair analysis, claiming, first, that such evidence is not sufficiently reliable, and second, that, in the circumstances of the present case, its probative value was outweighed by its prejudicial effect. Alternatively, the defendant sought a preliminary hearing on the admissibility of any such evidence. The trial court denied the defendant's motion along with her request for a preliminary hearing.

At trial, the state elicited testimony from Elaine Pagliaro, the acting director of the state police forensic laboratory, concerning microscopic analysis that she had performed on hair found at the scene of the crime and at Alexis Grajales' residence. With respect to two hair fragments[30] that were recovered from a box of latex gloves found in Grajales' residence, Pagliaro testified that a microscopic hair comparison of those fragments with known hair samples from the defendant indicated that one of the fragments had characteristics similar to that of the defendant's hair. Pagliaro also testified, however, that subsequent mitochondrial DNA (mtDNA) testing had excluded the defendant as the source of either of the two hair fragments.[31] Pagliaro further testified that she also had performed a microscopic examination of a hair fragment that was found on a tank top

[30] Pagliaro testified that a particle of hair from which the root has been severed is referred to as a hair fragment.

[31] Pagliaro explained that mtDNA analysis is not a positive means of identification; rather, it narrows the source of the DNA to persons within a maternal line. While mtDNA is shared by persons within a particular maternal line, nuclear DNA is shared only by identical twins. See *State* v. *Pappas*, 256 Conn. 854, 882, 776 A.2d 1091 (2001). Pagliaro also testified that nuclear DNA testing could not be done on the hair fragments recovered in the present case because that type of DNA is found only in the roots of the hair, and no such roots were recovered in the present case. As Pagliaro further explained, however, "[mtDNA] testing is more individualizing than microscopic hair comparison of a [hair] fragment and can narrow the possible sources of that hair."

that was seized by the police from Tammi Cuyler's bed, the bed in which Jarrell had been sleeping when he was murdered. According to Pagliaro, that fragment had microscopic characteristics consistent with the defendant's hair but not consistent with Tammi's hair. Pagliaro also testified that subsequent mtDNA testing on the hair fragment revealed that the hair originated from the maternal line shared by the defendant and Tammi. Pagliaro testified, however, that she could not state positively that the hair fragment that had been found on the tank top was the defendant's hair.

With respect to microscopic hair analysis generally, Pagliaro stated that it is impossible to determine whether a particular hair fragment comes from a particular individual and, therefore, microscopic hair comparison is not a positive means of identification. Pagliaro also testified that it is possible for two different individuals to have hair that is microscopically indistinguishable. She further testified that hair that has been subject to mtDNA testing and found to have originated from different individuals nonetheless may contain microscopically similar characteristics.

Before addressing the merits of the defendant's claim, we note, preliminarily, that "[t]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 167–68, 847 A.2d 978 (2004); see also Conn. Code Evid. § 7-2.

Furthermore, "[b]eyond these general requirements regarding the admissibility of expert testimony, [t]here is a further hurdle to the admissibility of expert testimony when that testimony is based on . . . scientific [evidence]. In those situations, the scientific evidence that forms the basis for the expert's opinion must undergo a [threshold] validity assessment [by the court] to ensure reliability. *State* v. *Porter*, [241 Conn. 57, 68–69, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)]. In *Porter*, this court followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence." (Internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, supra, 269 Conn. 168. "*Porter* explicitly stated that the flexible *Daubert* approach was a better approach than the test of general acceptance in the scientific community, which was established in *Frye* v. *United States*, 294 F. 1013 (D.C. Cir. 1923)." *State* v. *Reid*, 254 Conn. 540, 545, 757 A.2d 482 (2000). "Following *State* v. *Porter*, supra, 81–84, scientific evidence, and expert testimony based thereon, usually is to be evaluated under a threshold admissibility standard assessing the reliability of the methodology underlying the evidence and whether the evidence at issue is, in fact, derived from and based upon that methodology . . . ." (Citation omitted; internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, supra, 168.

"The mere fact that scientific evidence is sought to be admitted into evidence, however, does not require necessarily that a *Porter* inquiry be conducted as to the threshold admissibility of the evidence. As we have recognized, some scientific principles have become so well established that [a threshold admissibility] analysis

is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand [such an] analysis, and thus may be admitted simply on a showing of relevance. . . . Thus, we exclude from the *Porter* standard the very few scientific principles [that] are so firmly established as to have attained the status of scientific law . . . [and] properly are subject to judicial notice." (Citation omitted; internal quotation marks omitted.) Id., 169.

Moreover, "certain types of evidence, although ostensibly rooted in scientific principles and presented by expert witnesses with scientific training, are not 'scientific' for . . . purposes of our admissibility standard for scientific evidence, either before or after *Porter* [was decided]." Id., 170 n.22. Thus, "even evidence with its roots in scientific principles, which is within the comprehension of the average juror and which allows the jury to make its own conclusions based on its independent powers of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not be considered 'scientific' in nature for . . . purposes of evidentiary admissibility." Id., 170–71 n.22. "[E]vidence . . . which merely places a jury . . . in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge . . . is not the type of scientific evidence within the contemplation of *Porter*, and similarly was not within the ambit of our standard for assessing scientific evidence prior to *Porter*." (Citations omitted; internal quotation marks omitted.) Id., 170 n.22.

We now turn to the merits of the defendant's claim, which we conclude is foreclosed by our recent decision in *State* v. *Reid*, supra, 254 Conn. 540, in which we considered and rejected a challenge to the admissibility of microscopic hair analysis that was identical in all

material respects to the claim that the defendant raises in the present case. In *Reid*, the defendant, Mark Reid, was charged with kidnapping and sexual assault. See id., 542. Three unknown hairs were found on clothing that the victim had been wearing on the night that she was attacked. Id., 545. Over Reid's objection, the state presented testimony from Kiti Settachatgul, a criminologist with the state police forensic laboratory, who had compared those hairs microscopically with hairs that had been provided by Reid. Id., 544–45. Settachatgul concluded that the characteristics of Reid's hairs were similar to the characteristics of the hairs recovered from the victim's clothing. Id., 545. During his testimony, Settachatgul displayed an enlarged photograph that depicted, side-by-side, one of the defendant's hairs and one of the hairs recovered from the victim's clothing as they appeared under the microscope. Id., 547. Settachatgul also explained the various features of the hairs and their similarities. Id.

On appeal to this court, Reid claimed, inter alia, that the microscopic hair analysis evidence was inadmissible under *Porter* because such evidence is unreliable and inherently subjective. Id., 544. We rejected Reid's claim, concluding that the evidence was admissible without any threshold showing of reliability. Id., 549. We explained that, "[a]lthough Settachatgul's training [was] based in science, he testified about a subject that simply required the jurors to use their own powers of observation and comparison. . . . The jurors were free to make their own determinations as to the weight they would accord the expert's testimony in the light of the photograph and their own powers of observation and comparison. The jurors were not subject to confusing or obscure scientific evidence, but were able to use the testimony to guide them in their own determination of the similarity of the two hairs."[32] Id., 547–48. We also

[32] In *State* v. *Reid*, supra, 254 Conn. 547, we explained that Settachatgul's testimony was akin to the expert podiatric testimony in *State* v. *Hasan*, 205

observed in *Reid* that, "[a]lthough . . . no Connecticut appellate court previously ha[d] held that the technique of microscopic hair analysis [was] so well established that it [did] not require a hearing under *Porter* or *Frye* . . . testimony based on the technique [had] been admitted in Connecticut courts for many years. See *State* v. *King*, 249 Conn. 645, 656, 735 A.2d 267 (1999) (human hairs found on ski mask were similar to hair samples taken from both victim and defendant); *State* v. *Conn*, 234 Conn. 97, 104–105, 662 A.2d 68 (1995) (hair samples from defendant were not similar to hairs found at scene of crime); *State* v. *Roseboro*, 221 Conn. 430, 435, 604 A.2d 1286 (1992) (hair at scene of crime was microscopically similar to defendant's body hair); *Asherman* v. *State*, 202 Conn. 429, 436, 521 A.2d 578 (1987) (knapsack relevant because it contained hair that was microscopically similar to hair of defendant); *State* v. *Burns*, 173 Conn. 317, 323, 337 A.2d 1082 (1977) (hair at scene of crime similar to hair of defendant and victim)."

---

Conn. 485, 488, 534 A.2d 877 (1987), which testimony we concluded was not subject to a threshold admissibility determination. Id., 490. As we stated in *Reid*, in *Hasan*, "we upheld the admission of the testimony of a podiatrist as to the likelihood that a pair of sneakers would fit the defendant's feet. We concluded that the podiatrist's testimony was not scientific evidence subject to the *Frye* test because the podiatrist merely compared the footwear to the defendant's feet. Id., 491. Accordingly, the jury [was] in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. Id. The testimony was not based on obscure scientific theories; id., 491; that had the potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed. . . . Id., 490. Rather, the podiatrist's testimony concerned a method, the understanding of which is accessible to the jury; id., 491; and the value of the expertise lay in its assistance to the jury in viewing and evaluating the evidence. Id., 494. Although the podiatrist's skill and training were based on science, the subject to which he testified was a matter of physical comparison rather than scientific test or experiment. Id., 490; see also *State* v. *Ortiz*, 198 Conn. 220, 227, 502 A.2d 400 (1985) (opinion testimony of forensic odontologist that defendant made bites in partially eaten apple found at scene admissible)." (Internal quotation marks omitted.) *State* v. *Reid*, supra, 546–47.

*State* v. *Reid*, supra, 254 Conn. 549. Finally, we stated in *Reid* that, "even if a *Porter* hearing were necessary, the trial court properly conducted the hearing and found that microscopic hair analysis satisfied the *Porter* test because of its general acceptance in the scientific community."[33] Id., 549 n.3.

We reject the defendant's contention that she was entitled to a *Porter* hearing for the reasons that we rejected the same claim in *Reid*. As we explained in *Reid*, expert testimony concerning microscopic hair analysis, although rooted in science, is not the type of evidence that is subject to a threshold reliability hearing under *Porter* because the evidence simply requires jurors to employ their own powers of observation and comparison. Id., 547–49. Moreover, even if the methodology underlying microscopic hair analysis were such as to make it the proper subject of a *Porter* hearing, the technique would pass muster under *Porter* because, as we noted in *Reid*, it generally is accepted in the scientific community. Id., 549 n.3; see *State* v. *Porter*, supra, 241 Conn. 85 ("if a trial court determines that a scientific methodology has gained general acceptance, then the *Daubert* inquiry will generally end and the conclusions derived from that methodology generally will be admissible").

The defendant contends, nevertheless, that we should overrule *Reid* because microscopic hair analysis is " 'junk' science [that] has no place in a criminal trial." Contrary to the defendant's contention, "[t]he microscopic comparison of morphological characteristics of human hairs has been accepted both scientifically and legally for decades." M. Houck & B. Budowle, "Correlation of Microscopic and Mitochondrial DNA Hair Com-

---

[33] In *Reid*, the trial court had conducted a hearing under *Porter* and concluded that Settachatgul's testimony was sufficiently reliable to warrant its admissibility. See *State* v. *Reid*, supra, 254 Conn. 545.

parisons," 47 J. Forensic Sci. 964, 964–65 (2002). As one court has stated, "[t]he cases in which courts have excluded hair evidence are so rare that they literally amount to only a handful of precedents." *State* v. *Fukusaku*, 85 Haw. 462, 473, 946 P.2d 32 (1997). The overwhelming majority of courts have deemed such evidence admissible. E.g., *United States* v. *Matta-Ballesteros*, 71 F.3d 754, 766–67 (9th Cir. 1995); *United States* v. *Hickey*, 596 F.2d 1082, 1089 (1st Cir.), cert. denied, 444 U.S. 853, 100 S. Ct. 107, 62 L. Ed. 2d 70 (1979); *United States* v. *Brady*, 595 F.2d 359, 362–63 (6th Cir.), cert. denied, 444 U.S. 862, 100 S. Ct. 129, 62 L. Ed. 2d 84 (1979); *United States* v. *Cyphers*, 553 F.2d 1064, 1071–72 (7th Cir.), cert. denied, 434 U.S. 843, 98 S. Ct. 142, 54 L. Ed. 2d 107 (1977); *United States* v. *Santiago*, 156 F. Sup. 2d 145, 152 (D.P.R. 2001); *Jent* v. *State*, 408 So. 2d 1024, 1029 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S. Ct. 2916, 73 L. Ed. 2d 1322 (1982); *McGrew* v. *State*, 682 N.E.2d 1289, 1292 (Ind. 1997); *Johnson* v. *Commonwealth*, 12 S.W.3d 258, 262–63 (Ky. 1999); *Robinson* v. *State*, 18 Md. App. 678, 697–98, 308 A.2d 734 (1973); *Commonwealth* v. *Tarver*, 369 Mass. 302, 310–11, 345 N.E.2d 671 (1975); *State* v. *White*, 621 S.W.2d 287, 292–93 (Mo. 1981); *State* v. *Harrison*, 218 Neb. 532, 537–38, 357 N.W.2d 201 (1984); *People* v. *Allweiss*, 48 N.Y.2d 40, 49–50, 396 N.E.2d 735, 421 N.Y.S.2d 341 (1979); *State* v. *Lord*, 117 Wash. 2d 829, 849–50, 854–55, 822 P.2d 177 (1991), cert. denied, 506 U.S. 856, 113 S. Ct. 164, 121 L. Ed. 2d 112 (1992). Moreover, the defendant has failed to identify a case decided subsequent to *Reid* that questions the validity or reliability of microscopic hair analysis.[34]

---

[31] Indeed, the defendant cites only one case, *Williamson* v. *Reynolds*, 904 F. Sup. 1529 (E.D. Okla. 1995), in support of her contention that we should overrule *Reid* because of the unreliability of microscopic hair analysis. In *Williamson*, the District Court concluded that the habeas petitioner was entitled to a new trial due in part to ineffective assistance of counsel. Id., 1546, 1552. The District Court also concluded that certain microscopic hair analysis evidence improperly had been admitted into evidence at the petitioner's trial because, in the District Court's view, such evidence is unreliable.

The defendant also maintains that advances in mtDNA testing have demonstrated the inherent unreliability of microscopic hair analysis. In support of this claim, the defendant notes that, although Pagliaro had concluded that one of the hair fragments recovered from the box of latex gloves found in Grajales' residence was microscopically similar to the defendant's hair, subsequent mtDNA testing excluded the defendant as the source of that hair fragment.[35] The limitations of microscopic hair analysis, however, are well-known, and defense counsel highlighted those deficiencies in compelling detail during his cross-examination of Pagliaro.[36]

See id., 1552. The United States Court of Appeals for the Tenth Circuit affirmed the determination of the District Court that the petitioner was entitled to a new trial on the basis of ineffective assistance of counsel. *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997). As we expressly noted in *Reid*, however, the Tenth Circuit Court of Appeals rejected the District Court's finding regarding the inadmissibility of microscopic hair analysis evidence because, according to the Court of Appeals, the District Court had applied the wrong standard in deciding that issue. *State v. Reid*, supra, 254 Conn. 548; see *Williamson v. Ward*, supra, 1522–23. We also note that challenges to the admissibility of microscopic hair analysis evidence based on the District Court's analysis in *Williamson* uniformly have been rejected. See, e.g., *Johnson v. Commonwealth*, supra, 12 S.W.3d 263; *State v. Southern*, 294 Mont. 225, 243–44, 980 P.2d 3 (1999); *Bryan v. State*, 935 P.2d 338, 359 n.62 (Okla. Crim. App.), cert. denied, 522 U.S. 957, 118 S. Ct. 383, 139 L. Ed. 2d 299 (1997).

[35] The defendant also notes that, after the issuance of our opinion in *State v. Reid*, supra, 254 Conn. 540, mtDNA testing on three hairs found on the clothing of the victim in that case demonstrated that, although the state's expert, Settachatgul, had testified at trial that those hairs were microscopically similar to Reid's hair, Reid was not the source of those hairs. *Reid v. State*, No. CV020818851, 2003 WL 21235422, *11 (Conn. Super. May 14, 2003). In light of that determination, Reid was granted a new trial, and the state thereafter nolled the charges against Reid. See id., *22.

[36] For example, Pagliaro testified that, in contrast to fingerprints, hair particles are not unique and, therefore, microscopic hair analysis is not a positive means of identification because microscopically similar hair fragments do not necessarily derive from the same source. Pagliaro also acknowledged that: it is possible for different persons to have hair that it is microscopically indistinguishable; there are no universally accepted procedures governing how much weight an examiner should give to specific hair characteristics; each examiner must exercise his or her own judgment in determining whether a particular hair fragment is long enough for compari-

Thus, the jurors were able to evaluate the evidence in light of its acknowledged limitations and to give that evidence whatever weight they deemed appropriate. Moreover, the fact that mtDNA hair analysis is more precise than microscopic hair analysis does not render evidence regarding the latter inadmissible. "[T]he necessarily imprecise character of the hair identification [goes] to the weight of the microscopic hair [analysis] testimony, rather than its admissibility." *United States* v. *Oaxaca*, 569 F.2d 518, 526 (9th Cir.), cert. denied, 439 U.S. 926, 99 S. Ct. 310, 58 L. Ed. 2d 319 (1978); see also *United States* v. *Matta-Ballesteros*, supra, 71 F.3d 766 (rule 702 of Federal Rules of Evidence, which governs admissibility of expert testimony, did not warrant exclusion of microscopic hair analysis, and objection to such testimony went to its weight rather than admissibility). Indeed, as we stated in *Porter*, "[a]s long as the expert's methodology is well founded, the nature of the expert's conclusion is generally irrelevant, even if it is controversial or unique. . . . [In other words] [o]nce the methodology underlying an expert conclusion has been sufficiently established, the mere fact that controversy, or even substantial controversy, surrounds that conclusion goes only to the weight, and not to the admissibility, of such testimony." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 83. Because the validity of the methodology underlying microscopic hair analysis is well established, we decline to overrule our determination in *Reid* that the technique is sufficiently reliable to warrant the admissibility of evidence thereof without the need for a threshold finding of reliability. Accordingly, we reject the defendant's claim that the trial court

son purposes; and the characteristics of hair are not consistent throughout the length of the hair strand, so that a single strand of hair may exhibit characteristics near the root that are different from those exhibited closer to the tip.

improperly permitted the state to adduce Pagliaro's testimony concerning microscopic hair analysis.[37]

## III

The defendant next claims that her right to present a defense was violated when the trial court precluded

[37] The defendant raises several additional claims. First, the defendant maintains that we should follow the decision of the United States Supreme Court in *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (*Kumho Tire*), and grant to our trial courts the discretion to apply *Daubert* and *Porter* to all expert testimony, not just expert testimony based on scientific knowledge. The defendant further maintains that we should remand the case to the trial court to afford that court the opportunity to conduct a hearing in accordance with *Kumho Tire*. We need not decide whether to follow *Kumho Tire* because, even if we did so, that decision "would not alter our conclusion [in the present case] that the trial court properly admitted the [microscopic hair analysis testimony]." *State* v. *Reid*, supra, 254 Conn. 549 n.4.

The defendant also claims that the trial court improperly declined to conduct a *Porter* hearing because such a hearing was necessary to the court's determination of whether Pagliaro's testimony was more prejudicial than probative. The defendant's claim lacks merit. We never have suggested that a trial court must conduct a *Porter* hearing for the purpose of balancing the probative value of proffered scientific evidence against its prejudicial effect, and we see no reason to do so today. The determination of whether otherwise relevant evidence should be excluded as unduly prejudicial generally will not require a *Porter*-type hearing. In the present case, the defendant was free to inform the court of the limitations inherent in microscopic hair analysis, and defense counsel did so. As we have explained, the trial court properly permitted the state to present Pagliaro's testimony regarding the results of her microscopic hair analysis despite the limitations of that technique.

Finally, the defendant urges us to invoke our supervisory authority to prohibit any future use of microscopic hair analysis evidence in criminal trials unless that evidence is accompanied by corroborative mtDNA testing. We decline the defendant's invitation in light of the widespread acceptance that microscopic hair analysis enjoys in the scientific and legal communities. It undoubtedly is true that these two techniques, when used together, complement one another. See, e.g., M. Houck & B. Budowle, supra, 47 J. Forensic Sci. 964–65 ("The advent of [mtDNA] sequencing provides an additional test in the repertoire for assessing source association between a questioned hair and an individual. Neither the microscopic nor molecular analysis alone, or together, enables absolute positive identification; together, however, these methods can be complementary examinations. For example, mtDNA typing can often distinguish between hairs from different sources although they have similar morphological characteristics (or insufficient characteristics); in contrast, hair morphology comparisons can often distinguish between samples from different individuals [who] are maternally related, where

defense counsel from eliciting the testimony of Nicole Coleman for the purpose of impeaching the state's key witness, Alexis Grajales. We reject the defendant's claim because we conclude that the trial court did not abuse its discretion in excluding Coleman's testimony.

Certain additional facts are relevant to this issue. On direct examination, Grajales testified that he and the defendant had entered the victims' home in the early morning hours of July 9, 1998, and that the defendant had killed Jarrell and wounded Lindsey. On cross examination, Grajales testified that he did not recall ever having broken into a house prior to that morning. Grajales further testified that he had never told the defendant that he previously had broken into a house in the middle of the night for the purpose of committing a larceny. He also testified that he had never told the defendant that he was a professional burglar.[38]

mtDNA analysis is uninformative."). Neither that fact nor the fact that mtDNA analysis is more precise than microscopic hair analysis warrants the conclusion that the latter is so lacking in reliability that evidence thereof should be inadmissible in the absence of corroborative mtDNA testing.

[38] Grajales testified on cross-examination as follows:

"[Defense Counsel]: Had you ever broken into a house before?

"[Grajales]: Not that I recall, no.

"[Defense Counsel]: Well, you would recall it if you did. If you did it, you would recall it, wouldn't you?

"[Grajales]: I believe so.

"[Defense Counsel]: Have you ever broken into a house before?

"[Grajales]: No, not that I recall."

Grajales subsequently testified on cross-examination as follows:

"[Defense Counsel]: . . . [I]n any of the conversations you had with [the defendant], had you ever told her that you broke into a house in the middle of the night running around and stealing things?

"[Grajales]: No, I did not.

"[Defense Counsel]: Separate and distinct from this incident. I'm not talking about this incident you understand.

"[Grajales]: Correct.

"[Defense Counsel]: Did you ever tell [the defendant] prior to July [9], 1998, that you were a professional?

"[Grajales]: No, I did not."

Thereafter, defense counsel informed the state that he intended to call Coleman, the defendant's former cell mate,[39] to testify that Grajales was an experienced burglar and thief. The state objected to Coleman's testimony, claiming, inter alia, that it constituted inadmissible extrinsic evidence of a collateral matter. The trial court sustained the state's objection to the testimony on the ground that a witness may not be impeached with extrinsic evidence of a collateral matter. The defendant subsequently testified that "[Grajales] told me he was a professional, that he could get in and out of people's homes without them knowing he'd ever been there. He told me that he and his boys have done it before . . . [and] that he had been in different homes running around stealing things and no one knew he was there at the time." According to the defendant, Grajales also had told her that he previously had stolen "VCRs, stereos, rims, car rims . . . [and] appliances."

"A witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case. . . . Thus, the answer of the witness on cross-examination [as] to a collateral matter is conclusive and cannot be later contradicted." (Citations omitted; internal quotation marks omitted.) *State v. Colton*, 227 Conn. 231, 247–48, 630 A.2d 577 (1993); see also Conn. Code Evid. § 6-6 (b), commentary ("the examiner must introduce the witness' untruthful conduct solely through examination of the witness himself or herself"). Thus, "[i]t has long been the rule in Connecticut that extrinsic evidence may not be used to contradict the testimony of a witness with regard to a particular act of misconduct. . . . [I]f the witness

[39] The defendant had been unable to post bail subsequent to her arrest and she therefore was incarcerated pending trial. Coleman was the defendant's cell mate for some period of time during the defendant's pretrial incarceration.

stands his ground and denies the alleged misconduct, the examiner must take his answer not that he may not further cross-examine to extract an admission, but in the sense that he may not call other witnesses to provide the discrediting acts." (Citation omitted; internal quotation marks omitted.) *State* v. *Horton*, 8 Conn. App. 376, 380, 513 A.2d 168, cert. denied, 201 Conn. 813, 517 A.2d 631 (1986).

"Extrinsic evidence may be admitted, however, if the subject matter of the testimony is not collateral, that is, if it is relevant to a material issue in the case apart from its tendency to contradict the witness. . . . Evidence tending to show the motive, bias or interest of an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, supra, 227 Conn. 248; see also Conn. Code Evid. § 6-5, commentary.[40] "The determination of whether a matter is relevant or collateral . . . generally rests within the sound discretion of the trial court." *State* v. *Colton*, supra, 248.

On appeal, the defendant first claims that Coleman's testimony was not collateral in light of the defendant's theory that Grajales was an experienced thief who had persuaded the defendant that he could break into Tammi's home with one of his "boys." In particular, the defendant contends that the excluded testimony was not being offered solely to impeach Grajales but also

---

[40] Section 6-5 of the Connecticut Code of Evidence provides: "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." The accompanying commentary provides in relevant part: "Because evidence tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly." (Citations omitted.) Conn. Code Evid. § 6-5, commentary.

to establish, in accordance with § 4-5 (b) of the Connecticut Code of Evidence,[41] that he was capable of committing the criminal acts that, according to the defendant, he offered to commit. We are not persuaded.

It is true, of course, that the defendant strongly contested Grajales' credibility as a witness. It also is true that Grajales' testimony was a critical component of the state's case against the defendant. The general rule precluding the use of extrinsic evidence for impeachment purposes, however, admits of no exception merely because the witness is a key witness. Indeed, the primary reason for the exclusion of such extrinsic evidence, namely, its potential for provoking a minitrial that is likely to distract the jury from the main issues; see, e.g., *State* v. *Valentine*, 240 Conn. 395, 408, 692 A.2d 727 (1997); 1 C. McCormick, Evidence (5th Ed. 1999) § 49, p. 199; is equally compelling regardless of whether the witness is important.

Moreover, we agree with the state that Grajales' alleged experience as a burglar had little, if any, bearing on the central issue in the case, namely, whether the defendant was the person who had accompanied Grajales into Tammi Cuyler's home on July 9, 1998, and had attacked Jarrell and Lindsey. Simply put, Grajales' experience as a burglar had virtually nothing to do with the issue of whether the defendant or some unidentified person had accompanied Grajales into the victims' home on the night of the attack. Consequently, the trial court properly concluded that Grajales' testimony

---

[41] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) . . . Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) . . . Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . .

regarding his experience as a burglar was not subject to impeachment by extrinsic evidence.[42]

The defendant further contends that she was entitled to present Coleman's testimony under § 6-5 of the Connecticut Code of Evidence; see footnote 40 of this opinion; which permits the use of extrinsic evidence to impeach a witness for the purpose of showing bias, prejudice or interest. Conn. Code Evid. § 6-5, commentary. In particular, the defendant maintains that, because Grajales never told the state that he had committed prior burglaries, he was forced to lie about that previous criminal involvement in his trial testimony lest he be in violation of the requirement of his plea agreement that he cooperate with the state and testify truthfully. We disagree with the defendant's contention. There is nothing in the record to indicate that the state ever asked Grajales whether he had committed other burglaries. There is no reason to believe, therefore, that any concession by Grajales that he previously had

---

[42] Furthermore, whether Grajales was, in fact, an experienced burglar was irrelevant even to the defendant's claim that she had hired Grajales to enter Tammi's home surreptitiously in reliance on Grajales' representation that he previously had burglarized a number of homes. With regard to that claim, the only relevant issues were whether Grajales had made that representation to the defendant and whether she had relied on it. It simply made no difference, for purposes of the defendant's claim, whether Grajales, in fact, was an experienced burglar. If the jury believed the defendant's testimony that Grajales had told her that he was an experienced burglar, her claim would have had the same force whether Grajales was telling her the truth about his experience or whether Grajales was lying to the defendant about that experience. Conversely, if the jury did not believe the defendant's testimony that Grajales had held himself out as an experienced burglar, her claim would have had no force even if Grajales did, indeed, have a history committing burglaries. Consequently, extrinsic evidence purporting to establish that Grajales had committed other burglaries was collateral even to the defendant's claim that she had relied on Grajales' representation regarding his experience as a burglar.

The defendant also asserts that Coleman's excluded testimony was relevant to establish that Grajales was capable of entering Tammi's house without her permission. That fact was not in dispute, however, because Grajales himself acknowledged that he had done so.

committed burglaries would have given rise to a violation of his plea agreement. Consequently, the defendant's contention that Grajales had a motive to conceal his alleged prior burglaries must fail because it lacks support in the record.

## IV

The defendant next claims that the trial court improperly denied her motion for a mistrial upon learning, first, that two alternate jurors had participated in the selection of the jury foreperson, and second, that an alternate juror had contacted a regular juror by telephone during jury deliberations and inquired about the status of those deliberations. The defendant also claims that the trial court failed to conduct an adequate hearing upon learning that two jurors had proposed that a straw poll be taken among the jurors on the issue of the defendant's guilt. We are not persuaded that these instances of juror misconduct warrant a new trial.

The following facts and procedural history are necessary to our resolution of the defendant's claims. Immediately after the parties' closing arguments and before the trial court had instructed the jury on the law, the trial court excused two of the four alternate jurors with the agreement of the parties. The court then proceeded to charge the twelve regular jurors and the two remaining alternate jurors. Toward the end of its charge, the trial court instructed the jury as follows: "Your first duty when you go into the jury room will be to select a foreperson from among you. There is no prescribed method of doing that. It can be in any way you deem appropriate. . . . What the procedure is that now, after I excuse you, before you begin deliberations, I'm going to hear some comments of the attorneys relevant to my charge. It may be that if I misspoke or whatever, if they had a different assessment of the law, it may be that I may be calling you back to revise or augment or

correct something. So, I'm going to ask you not to begin deliberating, because of the hour, until after the luncheon recess. When you return from lunch, go into the jury room and select a foreperson. . . . But wait until the evidence comes in with the exhibits. That's the signal to you to begin deliberations. If the evidence doesn't come in with the information, hold off. That means I'm going to bring you out again and talk to you some more.

"Your verdict must be unanimous on each count. Now, under Connecticut law, despite what you see on [television], under Connecticut custom, you select a foreperson from among you. He or she has no more weight or authority than the other eleven jurors. He or she is just your spokesperson with the court. Any of your communications with the court should go through the foreperson, and the foreperson should make a note to the court, date it, time it and . . . sign it." The court thereafter completed its charge by stating: "I'm going to excuse the twelve jurors for—no, what I'm going to do is excuse all fourteen of you. You're not to deliberate yet, and I'll address the alternates before you're to begin deliberations. All fourteen of you are excused for the luncheon break. Do not commence deliberations until I indicate to you either here in court or through my [submission of] the evidence to you. Thank you. You're excused for lunch."

After the jury rendered its verdict for the guilt phase but before the penalty phase commenced, one of the alternate jurors, H,[43] advised the clerk that she had been in contact with some of the jurors after the verdict was rendered. To ascertain whether any prejudice to the defendant had resulted from this contact, the trial court

---

[43] We refer to individual jurors and alternate jurors by their initials to protect their legitimate privacy interests. E.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

conducted a hearing in open court and questioned five of the regular jurors and the two alternate jurors about conversations they had had with each other after the verdict. During the court's questioning of H, she revealed that, during a break in the court's jury instructions, she and the other remaining alternate juror, P, had participated in the selection of the jury foreman. H further explained that, as a result of close votes and ties, there had been several rounds of voting but that, when the candidates had been narrowed in number to two, the foreperson was selected by the flip of a coin.

H also testified that, during another break in the jury charge, two jurors had suggested to the other jurors that, once deliberations had begun, they should take a straw poll to see where they all stood on the issue of guilt as of that time. H further testified, however, that no straw poll actually was taken at that time and none of the jurors expressed an opinion regarding the defendant's guilt or innocence in H's presence. H also stated that she did not participate in any of the deliberations.

Another juror, W, testified that P had called him during jury deliberations and asked him, "[W]hat's going on?" According to W, he told P that the jurors were deliberating, that he did not "have the foggiest idea when [they would] be done," and that "that was the end of the conversation." When the trial court asked W whether he had discussed anything else about the case or the deliberations with P during their conversation, W responded, "Absolutely not." P further testified that the entire conversation lasted "maybe a minute, minute and a half."

The defendant thereafter filed a motion seeking a more thorough investigation of the juror misconduct or, alternatively, a mistrial. The trial court denied the motion, concluding that, although each of the incidents raised by the defendant constituted misconduct, none

of those incidents, viewed either alone or together, had prejudiced the defendant. On appeal, the defendant claims that she is entitled to a new trial as a result of each of the three instances of juror misconduct.

Before addressing the merits of the defendant's claim, we set forth the governing legal principles. "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution [of Connecticut, article first, § 8,[44] and by the sixth amendment[45] to the United States constitution] . . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . It is well established, however, that not every incident of juror misconduct requires a new trial. . . . [D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . The question is whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Citation omitted; internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 452, 862 A.2d 817 (2005).

"To ensure that the jury will decide the case free from external influences that might interfere with the

[44] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a . . . trial by an impartial jury. . . ."

[45] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ."

The sixth amendment right to a trial by an impartial jury is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *Ristaino* v. *Ross*, 424 U.S. 589, 595 n.6, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). We also note that the United States Supreme Court has concluded that the due process clause of the fourteenth amendment "independently require[s] the impartiality of any jury empaneled to try a cause . . . ." *Morgan* v. *Illinois*, 504 U.S. 719, 726, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

exercise of deliberate and unbiased judgment [we previously have held, pursuant to our supervisory authority over the administration of justice, that] a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . .

"Th[e] form and scope [of that preliminary inquiry] may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto. . . . We previously have instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jur[or] misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jur[or] misconduct; and (3) the state's interests of, inter alia, jur[or] impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jur[or] [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently,

the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jur[or] misconduct can fairly be characterized as an abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 672–73, 835 A.2d 895 (2003).

Finally, "in cases [in which] the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . [When], however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 47, 726 A.2d 513 (1999). We now review each of the defendant's claims in turn.

We first address the defendant's contention that she is entitled to a new trial because the two alternate jurors, H and P, participated in the selection of the foreperson. The defendant maintains that the participation of alternate jurors in the selection of a jury foreperson is prejudicial per se. In support of this claim, the defendant relies primarily on *United States* v. *Beasley*, 464 F.2d 468 (10th Cir. 1972), in which the Tenth Circuit Court of Appeals reversed the conviction of the defendant in that case on the basis of conduct similar to the conduct of H and P in the present case.[46] See id., 470–71.

---

[46] In *Beasley*, after the jury was instructed, "an alternate juror went along with the twelve jurors to the jury room. She participated in the vote to select a foreman, and voted to go to lunch. She was with the jury about twenty minutes after it retired. The court then realized that the alternate had not been discharged. Court was reconvened and the attorneys were advised that the alternate had retired with the twelve. Motion was made for a mistrial. The court then held a brief hearing to determine the extent [to which] the alternate had participated. At the conclusion of this hearing the motion for mistrial was denied." *United States* v. *Beasley*, supra, 464 F.2d

Subsequent to *Beasley*, however, the United States Supreme Court, in *United States* v. *Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993), held that "[t]he presence of alternate jurors during jury deliberations is not the kind of error that affect[s] substantial rights independent of its prejudicial impact. . . .

"Although the presence of alternate jurors does contravene the cardinal principle that the deliberations of the jury shall remain private and secret . . . the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence. [I]f no harm resulted from this intrusion [of an alternate juror into the jury room,] reversal would be pointless." (Citation omitted; internal quotation marks omitted.) Id., 737–38. *Olano* governs our resolution of the present case.[47] Consequently, the

469. On appeal, the Tenth Circuit Court of Appeals reversed the judgment of conviction; id., 471; concluding that, "[w]hen the case was submitted and the jury retired to deliberate, it then, with the selection of the foreman or with any other act to organize or plan the deliberation, began its own proceedings. Once these proceedings commenced, 'the jury' consisted only of the prescribed number of jurors. The alternate then became as any other stranger to the proceedings regardless of whether she had been discharged. . . .

"Once the prescribed number of jurors becomes 'the jury,' then, and immediately [then], any other persons are strangers to its proceedings. Their presence destroys the sanctity of the jury and a mistrial is necessary." Id., 469–70.

[47] We note that, in *United States* v. *Olano*, supra, 507 U.S. 737, the court concluded that the alternate jurors' improper presence during jury deliberations constituted a violation of rule 24 (c) of the Federal Rules of Criminal Procedure, which, at the time that *Olano* was decided, provided explicitly that "[a]n alternative juror who does not replace a regular juror shall be discharged after the jury retires to continue its verdict." Fed. R. Crim P. 24 (c) (relevant text repealed 1999). Because neither of the two defendants in *Olano* had objected to the alternate jurors' presence in the jury room during deliberations; *United States* v. *Olano*, supra, 730; the court analyzed their claim of impropriety under the plain error doctrine. Id., 737; see Fed. R. Crim. P. 52 (b). Although the defendant in the present case casts her claim in constitutional terms, she does not contend that the rationale of *Olano* is not equally applicable to that claim.

defendant is not entitled to any relief unless she can establish that prejudice resulted from the alternate jurors' participation in the selection of the foreperson.

The defendant claims that *Olano* is distinguishable from the present case because, in that case, although the alternate jurors were present during jury deliberations, they did not actually participate in those deliberations; see id., 729; by contrast, the alternate jurors in the present case actually participated in the selection of the foreperson. We disagree that the distinction advanced by the defendant is a meaningful one. The guiding general principle of *Olano* is that prejudice will not be presumed unless an alternate juror actually participated in jury deliberations. See id., 739–41. The selection of a foreperson, however, is not a part of jury deliberations. Consequently, the rationale of *Olano* applies with full force to the present case. We therefore require a showing of prejudice.[48]

The defendant has failed to demonstrate any prejudice flowing from the alternate jurors' participation in the selection of the foreperson. As the trial court

[48] The defendant urges us to adopt a rule of presumed prejudice, for purposes of our state constitution, when an alternate juror has participated in a jury "function," such as selecting a jury foreperson. In support of her state constitutional claim, the defendant relies primarily on sister state cases, decided prior to *United States* v. *Olano*, supra, 507 U.S. 725, in which such a presumption was adopted. E.g., *Commonwealth* v. *Sheehy*, 412 Mass. 235, 239, 588 N.E.2d 10 (1992); *State* v. *Bindyke*, 288 N.C. 608, 627, 220 S.E.2d 521 (1975). In those cases, however, the alternate jurors had been present during jury *deliberations*. E.g., *Commonwealth* v. *Sheehy*, supra, 236; *State* v. *Bindyke*, supra, 621. In the present case, however, the alternate jurors were not present during the deliberation process. Presumably, because of that fact, the defendant advances an expansive rule that would require the court to presume prejudice whenever any impropriety by an alternate juror relates to a jury "function . . . ." The defendant, however, has provided no support for such a broad rule under our state constitution, and we are aware of none. Consequently, we decline to adopt it. We need not decide today whether the state constitution requires a different rule than that adopted by the United States Supreme Court in *Olano* for cases in which an alternate juror actually is present during jury *deliberations*.

expressly instructed the jury, the foreperson is merely the juror chosen to act as the jury's spokesperson for purposes of its communications with the court. Other than that nonsubstantive responsibility, the role of the foreperson is precisely the same as all other jurors. In view of the trial court's instruction, there is no reason to believe that the jurors treated the foreperson any differently than any other juror.[49] See, e.g., *State* v. *Kirsch*, 263 Conn. 390, 416, 820 A.2d 236 (2003) (we presume that jury has followed instructions of court in absence of indication to contrary). The trial court did not abuse its discretion, therefore, in denying the defendant's motion for a mistrial based on the participation of the two alternate jurors in selecting the foreperson.

We also conclude that the trial court did not abuse its discretion in declining to grant the defendant a new trial on the basis of the predeliberation discussion among the jurors about conducting a straw poll regarding the defendant's guilt. Although the discussion occurred prior to the commencement of deliberations, the suggestion was that such a poll would be taken *after* deliberations had commenced. Moreover, the record establishes that no such poll was taken, if at all, at any time before the court had instructed the jury to begin its deliberations. Although the discussion occurred in the presence of alternate jurors H and P, there is no reasonable possibility, under the circumstances, that the defendant was prejudiced by that discussion.[50]

---

[49] The defendant asserts that the other jurors might have selected a different foreperson if the alternate jurors had not participated in the selection process, especially because the votes for foreperson were so close. Even if we assume, arguendo, that a different foreperson would have been selected if the alternate jurors had not voted, the defendant cannot establish prejudice because there is no reason to believe that the deliberations would have been different in light of the limited and nonsubstantive role that the foreperson plays as the spokesperson for the jury in its communications with the court.

[50] The defendant asserts that the trial court failed to conduct an adequate investigation into the jurors' discussion about the straw poll. We disagree. H candidly described that discussion in some detail, and there is nothing

With respect to the defendant's final claim regarding juror misconduct, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial based on the brief telephone conversation between W and P. When asked by the trial court whether he and P had discussed the case or the substance of the jury's deliberations, W responded unequivocally that he had not. In light of W's response, and in the absence of anything to contradict W's representations to the trial court, that court reasonably concluded that the conversation, although inappropriate, had not infringed upon the defendant's right to a fair and impartial jury. Because the defendant has failed to demonstrate how the conversation between W and P reasonably could have affected the jury deliberations, the defendant's claim is without merit.

V

Finally, the defendant contends that the trial court improperly instructed the jury with respect to the parties' failure to call as witnesses Sergeant Mark Francis of the Windsor police department and criminologist Kiti Settachatgul of the state police forensic laboratory. We disagree.

The following facts and procedural history are relevant to this claim. At trial, the state called as a witness Detective James McGlynn, who testified that he and Francis had questioned the defendant on July 17, 1998, at the Windsor police department regarding her activities at and around the time of the attack on Jarrell and Lindsey, and that, during that questioning, the defendant had confessed to killing Jarrell. Neither the state

to suggest that her testimony was not accurate. Moreover, the trial court was able to evaluate H's credibility and memory in light of the nature of the testimony that she had given. Under the circumstances, we cannot say that the trial court abused its broad discretion in concluding that no further inquiry into the incident was necessary.

nor the defendant called Francis as a witness. The state also called as a witness Elaine Pagliaro, the acting director of the state police forensic laboratory, who testified about certain microscopic hair comparison analyses that she had performed on hair fragments recovered from the crime scene and from Alexis Grajales' residence. Settachatgul, the former director of the state police forensic laboratory, also had performed those analyses. Neither the state nor the defendant called Settachatgul as a witness. In its instructions to the jury, the court apprised the jury that it could draw no adverse inference from the state's failure to call either Francis or Settachatgul as a witness.[51]

At the conclusion of the court's instructions, the defendant objected to the trial court's statement apprising the jury that it could draw no adverse inference from the fact that the state had not elected to call Francis and Settachatgul as witnesses.[52] After extensive oral argument on the issue of the propriety of that instruction, the trial court recalled the jurors to the courtroom and instructed them as follows: "I indicated last time the following: You can draw no inference from the election of the state not to call as witnesses Sergeant . . . Francis and [Mr.] Settachatgul, the gentleman from the state lab. That instruction is stricken in its entirety. You are to disregard that." The jury thereafter began its deliberations.

Later that same day, the jury informed the court that it was having difficulty understanding whether it could draw any conclusions or inferences from the fact that

---

[51] As both the state and the defendant acknowledge, the transcript of the trial court's jury charge contains no reference to this particular instruction. Nevertheless, as we explain more fully hereinafter, the trial court and the parties subsequently proceeded as if the charge, in fact, had been given.

[52] In addition, prior to the commencement of jury deliberations, the defendant also filed a motion for a mistrial that was predicated, in part, on that instruction.

Francis and Settachatgul had not testified.[53] In response, the trial court instructed the jury as follows: "Relevant to Sergeant Francis and Mr. Settachatgul, as I indicated to you in my instructions on the law, you cannot engage in speculation. The evidence has been presented to you. You must evaluate the evidence that has been presented and not speculate about what evidence has not been presented. You can consider whatever testimony was elicited in the orderly process of this trial relevant to Sergeant Francis and Mr. Settachatgul, and evaluate that testimony like you would any other testimony in accordance with the instructions I've given you. You cannot speculate as to what a person might have testified to if called as a witness nor can you make any inference as to the content of testimony of that witness. You can use the fact that a witness was not called by a party in assessing the apparent strength or weakness in the party's case."

At the completion of the court's explanation in response to the jury's question, a juror asked, "Can you repeat that? Could you just repeat that last—," to which the trial court replied: "Yes . . . . You can use the fact that a witness was not called by a party in assessing the apparent strength or weakness in the party's case. If a witness is available, he is equally available to both sides to call as a witness." Defense counsel objected to the court's last statement, claiming that it impermissibly had diluted the state's burden of proof and had undermined the presumption of innocence. The trial court rejected defense counsel's contention and did not instruct the jury further regarding the parties' failure to call Francis and Settachatgul as witnesses.

---

[53] The jury also had asked the court if it could consider the fact that another prospective witness, Roberto Marques, had not been called to testify. The court informed the jury that the court had ruled that Marques was unavailable to testify and that, consequently, the jury could draw no inference from the fact that he was not called. That portion of the court's instruction is not at issue in this appeal.

"The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 128, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 21, 818 A.2d 1 (2003).

On appeal, the defendant renews her challenge to the propriety of the trial court's final comment to the jury regarding the parties' failure to call Francis and Settachatgul to testify. The defendant contends that the instruction effectively precluded the jury from drawing whatever inferences it reasonably and naturally might have drawn from the state's failure to call the two witnesses. As a result, the defendant claims, the jury likely was misled into believing that reasonable doubt cannot arise from a lack of evidence, thereby improperly diluting the state's burden of proof. The defendant further contends that the instruction undermined the presumption of innocence by placing upon her the burden of calling the prospective witnesses.

We are not persuaded by the defendant's arguments. First, the trial court never intimated that reasonable doubt cannot arise from a lack of evidence. Furthermore, the court did not preclude the jury from drawing whatever inferences it deemed reasonable on the basis of a party's failure to call a particular witness; on the contrary, the court expressly and repeatedly informed the jury that it *could* do so. There also was no impropriety in the court's admonition that the jury was not free to speculate regarding the substance of any specific testimony that might have been adduced from Francis or Settachatgul had they been called to testify. See *In re Samatha C.*, 268 Conn. 614, 638, 847 A.2d 883 (2004) ("[a]n adverse inference . . . does not supply *proof* of any particular fact; rather, it may be used only to *weigh* facts already in evidence" [emphasis in original]).

We also disagree with the defendant that the challenged instruction undermined the presumption of innocence. Although the trial court should have refrained from instructing the jury regarding the missing witnesses; see *State* v. *Malave*, 250 Conn. 722, 738–39, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000);[54] we previously have explained that such an instruction does not impermissibly infringe upon the presumption of innocence. See id., 738 ("the giving of a [missing witness] charge is purely an evidentiary issue and is not a matter of consti-

[54] In *State* v. *Malave,* supra, 250 Conn. 730, 738, "we abandoned the missing witness rule in criminal cases . . . which previously had allowed the trial court to instruct the jury that it could draw an adverse inference from the failure of the party to produce an available witness whom the party naturally would have called to testify. . . . In abandoning the missing witness rule, however, we specifically noted that counsel was not prohibit[ed] . . . from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. Id., 739." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon,* 272 Conn. 106, 192–93, 864 A.2d 666 (2004).

tutional dimensions" [internal quotation marks omitted]). Moreover, the trial court thoroughly instructed the jury on that constitutional presumption and on the state's burden of proving the defendant's guilt beyond a reasonable doubt, expressly underscoring the fact that the defendant had "no burden or obligation to prove anything" and that the state "has the burden at all times to establish each of the elements of the crime[s] charged beyond a reasonable doubt." In light of the court's instructions as a whole, we are persuaded that there is no reasonable possibility that the jury was misled by the challenged portion of the charge.

The judgment is affirmed.

In this opinion the other justices concurred.