STATE OF CONNECTICUT *v.* TROY D. SULSER
(AC 28707)

Bishop, Lavine and McDonald, Js.

Argued November 28, 2007—officially released August 26, 2008

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Harry Weller,* senior assistant state's attorney, with whom were *James E. Thomas,* former state's attorney, and *Edward R. Narus,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Troy D. Sulser, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that he is entitled to a new trial because several of the trial court's

evidentiary rulings were improper as was its jury charge.[1] We affirm the judgment of the trial court.

The state's case consisted primarily of circumstantial evidence that the defendant had murdered the victim, his wife, Gina M. Sulser, to collect her life insurance proceeds, including accidental death benefits. The jury reasonably could have found the following facts on the basis of the evidence presented and the reasonable inferences drawn therefrom. On March 29, 2003, the defendant and the victim lived in the Carousel Apartment complex in East Windsor. Shortly after 11 p.m., the defendant placed two telephone calls to pizza restaurants before going to a McDonald's restaurant, where he purchased food for two people. He then returned to the apartment. At 12:45 a.m. on March 30, 2003, the defendant placed a 911 call to the police to report that his wife had been abducted. Lawrence Johnson, a sergeant in the East Windsor police department, reported to the apartment at about 1:15 a.m.

Johnson saw no signs of forced entry or of a struggle within the apartment. The defendant told Johnson that he and the victim had been out during the afternoon and evening and that when they returned to the apartment, he had tried to order pizza but the restaurants that he had telephoned were closing. He left the victim in the apartment with her cat, which was ill, and went to McDonald's in Windsor Locks. The defendant also told Johnson that when he returned, he could not find the victim in the apartment or in the complex laundry room. Although he did not consider the victim's absence

---

[1] The defendant claims that the court improperly (1) admitted extraordinarily gruesome autopsy photographs of the victim, (2) excluded evidence of a third party culprit and (3) permitted his cellmate to testify about the defendant's incriminating statements. He also claims that the court improperly (1) failed to give a jury instruction pursuant to *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), and (2) charged the jury with respect to reasonable doubt.

an emergency, he decided to call 911. After looking around the apartment,[2] Johnson suggested that he and the defendant search the complex and the surrounding area and contact the victim's friends and neighbors. The defendant responded that the victim would not go anywhere without him. The defendant's demeanor was matter of fact. After Johnson and the defendant had searched the exterior, Johnson instructed the defendant to telephone the victim's parents to find out if she was with them. The victim's parents had not seen her.[3]

Johnson asked the defendant if he had checked the basement. The defendant did not respond immediately but then told Johnson that the victim would not go into the basement. The defendant, however, looked at a desk, stated that the keys to the basement were missing and quickly left the apartment. Johnson followed him to the door of the basement, which is in the foyer of the apartment. The defendant opened the door. Although the stairway was not lit, Johnson could see a body lying at the bottom of the stairs. When he reached the body, later identified as the victim, Johnson observed that it was lying face down and that a purse and blood covered eyeglasses were nearby. Johnson detected no pulse and that the body was cold and concluded that the victim was dead. Johnson went outside to use his radio to summon additional assistance. When he returned to the basement, the defendant was sitting

[2] Johnson observed the victim's cat lying on the bed and boxes packed in anticipation of a move. The defendant told Johnson that the victim had packed the boxes. Johnson also saw food from McDonald's on a table.

[3] When the defendant telephoned the victim's parents at 1:30 a.m., they were asleep. The victim's mother, Nellie Molinari, answered the telephone. After the defendant explained that the victim was missing, Nellie Molinari asked the defendant where the victim's purse and glasses were. The defendant responded that they were in the apartment. Nellie Molinari reminded the defendant that the victim never went anywhere without him and told him to go look for her. Nellie Molinari thought that defendant sounded nonchalant throughout the conversation.

at the bottom of the stairs saying in a low voice, "my friend, my friend, she's my friend, what am I going to do without her." Johnson described the defendant's demeanor as calm.

Because the basement was not illuminated, Johnson went to the top of the stairs and saw that the light switch was in the up position. Johnson determined that the bulb was loose and tightened it. The bulb illuminated.[4] Johnson again observed the victim's body. The head was on the basement floor, the torso on the lowest steps and the feet on higher steps. He saw blood under the head and a set of keys by the feet. The defendant identified the keys as the ones missing from the apartment desk.

Sergeant Michael Poliquin, the shift supervisor, arrived at the apartment at about 2 a.m. He observed the body at the bottom of the basement stairs. Poliquin found lividity and rigor in the body and knew that medical assistance would be of no avail. After kneeling near the victim's body for some time, the defendant stated, "I know why she's here. It's my fault." Johnson asked the defendant why he said that. The defendant responded that earlier in the week, the victim had asked him to retrieve from the basement an animal carrier that the victim used when her cat had seizures. The defendant had not gotten the animal carrier, and he opined that the victim must have gone to the basement to get it.

Thomas J. Clynch III, chief of the East Windsor ambulance association and a paramedic, examined the body and made a presumption of death at 2:30 a.m. During

---

[4] Costas Georgacopoulos, one of the owners of the Carousel Apartments, testified that it was his custom to go to the apartments on a Saturday and make needed repairs. He had been working in the defendant's building on March 29, 2003, and noticed that the lightbulb at the bottom of the basement stairs was burned out. He replaced it, and it was working when he left the building.

his examination, Clynch noted that there were small, red blotches in the whites of the victim's eyes, meaning that blood vessels had ruptured. He documented his observation because it was an unusual finding given the circumstances. According to Clynch, head trauma from a fall would not result in ruptured blood vessels in the eyes. Clynch noted that the body was very cold and the face had a purple tinge to it. There was an injury to the face that was consistent with the dried blood on the floor. Clynch attempted to move the victim's joints and found rigor, which he testified was an indication of death. Clynch asked the defendant about the victim's medical history; in response, the defendant told him about the cat's medical history.

The defendant then returned to his apartment. Johnson followed him and discussed possible scenarios for disposition of the body and notifying the victim's parents. The defendant indicated that he would inform the victim's parents of her death. The defendant left the apartment to spend the rest of the night with his mother. He took an electronic organizer with him and told Johnson that "when you have a problem, you have to keep it organized."

Approximately two hours after he had telephoned the victim's parents, the defendant appeared at their home. Nellie Molinari asked him what was the matter. The defendant stated that the police had told him to come and talk to them. Nellie Molinari asked him where the victim was, and the defendant told her that she was at Manchester Memorial Hospital. The victim's mother asked why he was not with her. The defendant explained that the victim had a fetish for cats and animals, fell down stairs and was dead. The defendant displayed no emotion but asked the victim's father, Robert Molinari, what the defendant should do next. The victim's father asked the defendant to leave. Shortly thereafter, Robert Molinari left the house.

At approximately 4 a.m., Poliquin received information from the police dispatcher that Robert Molinari was at the police department and wanted to speak with someone. Poliquin left the apartment to speak with Robert Molinari. Poliquin also informed his superiors and others of the situation, and thereafter the state medical examiner and the state police became involved in the investigation.

As the result of a telephone call he received from Poliquin at approximately 4 a.m. on March 30, 2003, Matthew Carl, an East Windsor police detective, became involved in the investigation. Carl met with Robert Molinari and learned that the victim's father thought that her death was suspicious.[5] Carl later telephoned the defendant and met with him at the home

---

[5] Nellie Molinari and Robert Molinari testified about the defendant and the victim and their relationship with them. The victim and the defendant had been married in January, 1993. The victim was forty-five, ten years older than the defendant. The defendant and the victim only saw the victim's parents at holidays and birthdays and never entertained them in their own home. The victim and the defendant appeared to be a loving couple but had had financial problems. They lost their home in Enfield pursuant to a foreclosure and had their debts discharged in bankruptcy. Although Robert Molinari kept a vacation trailer at the Enfield property, he rarely went inside the house. After the victim and the defendant lost their Enfield home, the victim's parents did not know where the victim lived. The victim's parents thought that she was unhappy living in the apartment and was embarrassed of the apartment. The victim's parents were concerned by the fact that the victim had both a full-time job and a part-time job, and the defendant seemed to go from job to job.

The victim's parents also testified that the defendant and the victim had visited them in their home in January, 2003, for Robert Molinari's birthday. The victim told her parents that she and the defendant were purchasing life insurance because they thought it would help them get a mortgage loan so they could buy another house. Nellie Molinari, who had been a real estate agent for more than twenty-five years, was skeptical that the victim and the defendant would be able to get a mortgage loan so soon after having a foreclosure. The victim's parents saw no reason for the victim and the defendant to have life insurance; there were no children and they owned no home. The victim told her parents that the defendant thought that having life insurance would help them to get a mortgage loan. Robert Molinari saw no relationship between having life insurance and getting a mortgage loan.

Robert Molinari was disturbed by the description of the victim's death given to him by the defendant. He testified: "[W]hen people fall down the

of the defendant's mother at 6:16 a.m. The defendant cooperated with Carl's investigation. When asked, the defendant told Carl that he owned a computer business and that he previously had been employed by the Trolley Museum in East Windsor. Carl asked the defendant about the couple's finances. The defendant could not remember how much he had earned the previous year. When Carl reminded him that it was tax time and asked what their W-2 forms would reflect, the defendant stated that his income was in the mid to upper $40,000 range and that the victim had earned a salary in the upper $30,000 range.

The defendant also explained to Carl that he and the victim had spent the prior day looking at real estate because they wanted to purchase a house. They also went to an automobile dealership because "the two of them were itching to find a reason to buy a new truck." The defendant told Carl that the couple returned to the apartment at 11 p.m. and of his efforts to get something for them to eat and why the victim stayed at home with the cat. He also told Carl that he was at fault for the victim's death because he had not retrieved the animal carrier from the basement when the victim asked him to do so several weeks earlier. Carl asked the defendant if the victim's life was insured. The defendant told him that she had a small policy through her place of employment, Metco Health Care Company. When asked, the defendant told Carl that he and the victim had applied for $500,000 worth of life insurance on line in August, 2002. The defendant made a deposit on the policy, but he thought that the policy was no longer in effect because he had received a notice that the application had expired. The defendant also attempted to purchase

stairs, they may break an arm or they break a hip, they may get a fractured skull, but very few die." He told Carl that the victim and the defendant had bought life insurance, "and [that] the whole thing didn't sound very good" to him.

another life insurance policy from Allstate Insurance Company (Allstate), but the application was incomplete.

Carl then informed the defendant of his conversation with Robert Molinari and that the victim's father thought her death was suspicious. Carl asked the defendant what had occurred earlier at the Molinari home and told him that Robert Molinari said that he had asked the defendant to leave. The defendant reacted with shock. He told Carl that Robert Molinari had not asked him to leave and that he did not know why Robert Molinari would consider the victim's death suspicious.[6]

At approximately 11 a.m. on March 30, 2003, the defendant was interviewed by Stavros Mellekas and Nicholas DeJohn, state police detectives, who were investigating the victim's whereabouts for the twenty-four hours prior to her death. The defendant cooperated by giving a sworn written statement. According to the defendant, the victim and the defendant spent the morning doing laundry and cleaning their apartment. They went out at 1 p.m. and did not return until 11 p.m. During that time, they visited a Verizon store and had lunch. The defendant produced credit card receipts for purchases made at both places. The victim and the defendant met with a real estate agent[7] to look at a

---

[6] Carl terminated the interview at that point and indicated to the defendant that he would have to come to the police station to give a written statement. Carl left and contacted Madison Bolden, an inspector in the office of the state's attorney, because Carl found inconsistencies between the things the defendant had told him and what Robert Molinari had told him. Furthermore, the defendant's version of events was inconsistent with things Carl learned from Clynch and Poliquin. During Carl's interview, the defendant was cooperative and very matter of fact.

[7] Ralph Mazzarella, a real estate agent, met the defendant and the victim at 2:45 p.m. at 735 Old Stafford Road in Tolland, a sixteen acre piece of property with improvements. The old house was in significant disrepair. The victim and the defendant spent twenty minutes looking at the house before telling Mazzarella that the property was not suitable for them. The house was listed for sale at $219,000.

piece of property and visited an automobile dealership.[8] They also window shopped at the Manchester mall and took the long way home. During the interview, the defendant told Mellekas that the victim had no life insurance but that in November or December, 2002, the victim had sought life insurance from Allstate, which "did not go through."

On the basis of the defendant's statement, the state police further investigated. Jeffrey Schaefer, a state police detective, was the lead officer investigating the victim's death. He and DeJohn (detectives) asked the defendant to return to the East Windsor police department for further questioning because they discovered inconsistencies between his version of events and what their investigation revealed.[9] The detectives asked the defendant if the couple had returned to the apartment between 1 p.m. and 11 p.m. The defendant told them "no." When informed that they were seen in the foyer of the apartment between 7 and 8 p.m., the defendant offered that he and the victim had returned to the apartment to check e-mail messages.[10] Thereafter, the defendant told the detectives that the couple had returned a second time to check their e-mail.[11] The defendant

[8] The victim and the defendant went to Dillon Ford in Manchester where they met with Michael Hardick, a salesman, at about 4 p.m. The defendant expressed interest in a truck that he could use to pull his stock car. The type of vehicle that would meet the defendant's needs was an F-350 Ford pickup truck that cost approximately $50,000. There was not enough time for the defendant to test drive the vehicle before the dealership closed, so he arranged to return at 3 p.m. on Monday, March 31, 2003. The victim and the defendant remained at the dealership until it closed at 5 p.m.

[9] During their search of the apartment, the police found a check payable to Gina M. Sulser in the amount of $35.10 from Lincoln Benefit Life Company.

[10] Christine McDermott lived in an apartment near that of the defendant and the victim. McDermott was in the company of her friend, Terri Davis, when the two saw the victim and the defendant standing in the foyer next to the basement door between 7 and 8 p.m. on March 29, 2003. McDermott testified that the victim was not acting like herself.

[11] An examination of the defendant's computer records revealed that it had been accessed three times on March 29, 2003, specifically between 12:29 and 12:40 p.m., 5:30 and 6:50 p.m., and 9 and 9:40 p.m. Most of the sites

also told the detectives that the couple had made no telephone calls when they returned. The detectives also asked the defendant about life insurance, and he told them that the victim had a small policy with her employer and that the couple had applied for a policy, but it was never "put together."

The detectives told the defendant that the medical examiner had concluded that the victim's death was a homicide caused by strangulation between the hours of 7 and 8 p.m.[12] The defendant showed no emotion. At some point during the interview, the defendant mumbled that it was his fault but made no response when the detectives asked him what he meant by that. The detectives asked the defendant to provide another sworn written statement, but he refused and stated that he wanted to talk to an attorney.

The jury also heard evidence that although most of their friends thought that the victim and the defendant were an affectionate couple, they were not without marital problems. Marie Cusimano, a friend of the victim, testified that the victim appeared frazzled when she came to work one day. Cusimano learned that the victim had forgotten her car keys in the house, but the defendant would not open the door to let her in. The victim had to break a window to get her keys. On another occasion, the victim came to work wearing the same clothes that she had worn the day before. The defendant had made the victim sleep in her car all night.

The victim's close friend and mentor, Judith Brengi, testified that the victim and the defendant argued about various domestic issues and the victim often called

visited on the computer provided information about large trucks and recreational vehicles.

[12] Malka B. Shah, an associate medical examiner for the state, performed an autopsy of the victim's body on March 31, 2003. She testified that the victim died between 8 and 10 p.m. on March 29, 2003.

Brengi to complain about the defendant. Brengi described the victim as a nag. If the victim provoked the defendant, she was fearful of him. Brengi thought that the victim was depressed and unhappy about living in the apartment, rather than a house. The day before her death, the victim had told Brengi that she was ready to leave the defendant. Although Brengi had heard the victim express that sentiment before, there was something serious about the way she said it the day before she died. The victim had thought it through and was going to get an apartment.

The jury heard extensive testimony about the efforts the couple made to secure life insurance in the weeks preceding the victim's death. The defendant was informed by John Amato, a sales representative for Allstate, on March 17, 2003, that the life insurance policy on the victim's life had been approved.[13] At the time of her death, the victim's life was insured for $1,090,000; the defendant was the named beneficiary. In April and May, 2003, the defendant submitted applications for accidental death benefits on the basis of the victim's having fallen down stairs.

A warrant was issued for the defendant's arrest on August 1, 2003. Following his arrest, the defendant was charged with murder. The jury found him guilty, and the court sentenced him to fifty-five years in prison on September 22, 2005. This appeal followed.

I

The defendant claims that the court abused its discretion with respect to numerous evidentiary rulings. More specifically, the defendant claims that the court improperly (1) admitted extraordinarily gruesome photographs

[13] Amato also informed the defendant that because the results of the victim's physical examination were good, the quarterly premium would be less than quoted. The victim would, therefore, receive a refund of a portion of the premium paid with her application.

of the victim's autopsy, (2) excluded evidence of third party culpability and (3) permitted an informant to testify about certain statements made by the defendant. None of those claims has merit.

We review the court's evidentiary rulings under the abuse of discretion standard. See *State* v. *Lucas*, 63 Conn. App. 263, 273, 775 A.2d 338, cert. denied, 256 Conn. 930, 776 A.2d 1148 (2001). "A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Thomas*, 96 Conn. App. 578, 583–84, 901 A.2d 76, cert. denied, 280 Conn. 912, 908 A.2d 542 (2006).

## A

The defendant's first evidentiary claim concerns autopsy photographs depicting damage to the organs of the victim's neck that the state placed into evidence. The defendant claims that the photographs were extraordinarily gruesome, irrelevant and prejudicially inflamed the jury. We disagree.

The theory of defense was that the victim died when she fell down the basement stairs. Defense counsel argued that if the victim had been strangled, why had no one heard any commotion, especially given that the defendant and the victim were seen near the basement stairs at 7:15 p.m. At trial, the state placed into evidence a series of autopsy photographs during the testimony of Malka B. Shah, an associate medical examiner. The defendant had no objection to the admission of photographs marked state's exhibits fifty-one through fifty-seven. Those photographs were admitted to depict the deep tissue injuries to the victim's anterior neck and

larynx and to prove that the victim had been strangled violently and forcefully.

Defense counsel objected, however, to photographs marked state's exhibits fifty-eight, fifty-nine and sixty on the ground that they would inflame the passions of the jury. The photographs depicted organs that had been removed from the victim's neck and were, in the opinion of defense counsel, "over the top." Defense counsel further argued that they displayed the same injuries as those in exhibits fifty-one through fifty-seven. In objecting to exhibit sixty, a posterior view of the victim's cervical and thoracic spine, defense counsel described it as horrible because the image suggested that the victim had been "filleted" and was irrelevant. The state responded that exhibit sixty depicted the posterior of the victim's neck, which was not observable in the other exhibits. In addition, the state contended that the photographs demonstrated the amount of compression placed on the victim's body and were relevant to rebut the defendant's assertion that the body had been moved unprofessionally, which caused some of the injuries.[14]

The court ruled that the three exhibits were relevant and that their probative value outweighed any prejudice. Autopsy photographs by their very nature depict organs and tissue and are a necessary, although unfortunate, part of the evidentiary process, the court explained. The court, however, did not permit the photographic evidence to be projected onto a screen in the courtroom. Shah held the photographs before the jury while she explained her findings.

Shah testified that she had examined the body of the victim at the scene and in the autopsy setting. Shah's

---

[14] A paramedic testified that a patient should be turned by individuals with medical training, but after death, it does not matter how the body is turned.

external examination of the body revealed a bruise to the chin and cheek and a laceration of the lower lip. She also observed that the victim suffered petechial hemorrhaging of the eyes and upper and lower eyelids. Petechial hemorraghing is the result of a sudden neck compression that breaks small capillaries causing a small amount of blood to ooze into the surrounding tissue. Shah, however, found no external evidence of bruising or injuries to the neck and no signs indicating that a ligature had been placed around the neck. Shah's internal examination of the victim's neck revealed hemorrhages in the muscles at the base of the neck and organs located beneath the muscles. Shah concluded, therefore, that the compression had been caused by a soft, broad object.

Exhibit fifty-six demonstrates the force of the compression suffered by the victim. The muscles of the neck and the blood vessels were torn. Hemorrhaging in the deep muscles of the neck appeared only on the left side near the thyroid gland and carotid artery. When the muscles of the neck were retracted, Shah saw deeper hemorrhages in the larynx, which were confined to the left side. Shah also discovered hemorrhaging in the form of deep black discoloration on the epiglottis, larynx and nearby soft tissue. On the basis of her findings, Shah concluded that the victim had been strangled and that the most likely "weapon" had been the perpetrator's arm. Shah explained to the jury that a person strangled in such a way cannot scream. Furthermore, on the basis of the fall pattern and the evidence of bruises on the facial injuries, Shah concluded that those injuries occurred postmortem, i.e., the victim was dead when she fell. She also concluded that death occurred between 8 and 10 p.m. on March 29, 2003.

"The principles governing the admission of potentially inflammatory photographic evidence are clear. . . . [W]e adhere to the general rule that photographs

which have a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry are not rendered inadmissible simply because they may be characterized as gruesome. . . . When, however, an initial determination is made by the trial court that such photographs may have the tendency to prejudice or inflame the jury, the admissibility of such evidence is dependent upon the trial court's determination as to whether their value as evidence outweighs their possible prejudicial effect." (Internal quotation marks omitted.) *State* v. *Epps*, 105 Conn. App. 84, 94–95, 936 A.2d 701 (2007), cert. denied, 286 Conn. 903, 943 A.2d 1102 (2008). In *Epps*, this court concluded that photographs of the victim's injuries "admitted into evidence, while gruesome and numerous, were relevant and more probative than prejudicial"; id., 96; of the defendant's intent to disfigure the victim, an element of the charge of assault. Id., 95. Moreover, there were not too many photographs because each photograph depicted a different injury, and, thus, they were not cumulative. Id., 96.

"[P]hotographs of a corpse have been held properly admissible in prosecutions for homicide in spite of a claim that they constitute merely cumulative evidence. . . . It cannot be doubted that to offer wholly irrelevant evidence of a gruesome character merely to inflame the members of the jury would be indefensible and intolerable. On the other hand, the prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." (Citations omitted; internal quotation marks omitted.) *State* v. *Piskorski*, 177 Conn. 677, 701–702, 419 A.2d 1866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 621 L. Ed. 2d 194 (1979). "[W]hether allegedly inflammatory photographs are cumulative is a routine [issue] basic to a determination of relevancy,

and not [an issue] arising from any exceptional nature of the proffered evidence." (Internal quotation marks omitted.) Id., 701 n.11.

Photographs of an injury are independently admissible to prove the character, location and course of the injury. See *State* v. *Haskins*, 188 Conn. 432, 453, 450 A.2d 828 (1982). "Equally important, the test for determining the admissibility of the challenged evidence is relevancy and not necessity. . . . Since the trial court exercises a broad discretion in cases where relevant evidence is challenged as inflammatory its determination will not be disturbed on appeal unless a clear abuse of discretion is shown." (Citation omitted.) Id.

In this case, the theory of defense was that the victim died when she fell down the stairs to the basement. Shah's testimony and the photographic exhibits were relevant because they tended to prove that the victim's untimely death was not an accident, as the defendant asserted. The exhibits were relevant in proving not only that the victim had been strangled but also the manner in which strangulation had occurred and why no one heard the victim call out.[15] The degree of force applied to the victim's neck also permitted the jury to infer the defendant's intent to murder the victim. See *State* v.

---

[15] The state has argued that on cross-examination, the defendant elicited testimony from the police who investigated the victim's death that none of the canvassed residents heard any suspicious noise at the time of the victim's death. In his final argument, defense counsel argued: "We must believe—you must believe that [the defendant and the victim] first said hi to Terry Davis and Christine McDermott, then he waited until they left and then once they left, commit the crime, hope that nobody would hear a 270 pound man and a 185 pound woman halfway down wooden stairs while this attack took place. It took place in no less than thirty seconds, but as much as seven minutes; hope that nobody would hear through thin walls, hope that nobody would happen to go by on a busy Saturday night by the most heavily trafficked area in the apartments, clean up, hope he would have no marks or scratches on any kind and wait for the police to arrive. That is reasonable doubt."

*Moore*, 82 Conn. App. 267, 272, 843 A.2d 652, cert. denied, 269 Conn. 904, 852 A.2d 734 (2004). In its appellate brief, the state also has explained that exhibits fifty-eight and fifty-nine were not cumulative, as the photographs to which the defendant had no objection did not reveal the deeper injuries to the larynx, as did exhibits fifty-eight and fifty-nine. We conclude, therefore, that the court did not abuse its discretion by admitting state's exhibits fifty-eight, fifty-nine and sixty because those exhibits were relevant to the manner of death and the defendant's intent, and because their probative value outweighed any claimed prejudice.

## B

The defendant's second evidentiary claim is that the court improperly granted the state's motion in limine to preclude evidence of third party culpability, namely, that one of the victim's former boyfriends had threatened to strangle her. We disagree.

"The trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Francis*, 267 Conn. 162, 174, 836 A.2d 1191 (2003). "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 624, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). "A defendant is, however, bound by the rules of evidence in presenting a defense. . . . If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) Id., 624–25.

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn.

533, 564, 747 A.2d 487 (2000). "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the later." (Internal quotation marks omitted.) *State* v. *West,* supra, 274 Conn. 625. "[E]vidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt." *State* v. *Arroyo,* 284 Conn. 597, 609–10, 935 A.2d 975 (2007).

"The defendant must . . . present evidence that *directly* connects a third party to the crime. . . . *It is not enough to show that another had the motive to commit the crime* . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Emphasis added; internal quotation marks omitted.) Id., 609. Admissible third party culpability evidence "is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt." (Internal quotation marks omitted.) *State* v. *Smith,* 280 Conn. 285, 304, 907 A.2d 73 (2006).

The defendant's claim is predicated on the court's granting of the state's motion in limine filed on June 28, 2005. The state sought to preclude the defendant

from presenting evidence that a former boyfriend of the victim was responsible for her death. On July 14, 2005, after the state presented its evidence,[16] the defendant made the following offer of proof through counsel, not testimony, in opposition to the state's motion in limine. The third party culprit was alleged to be Mark Halpin, with whom the victim was romantically involved from 1978 to 1984. Halpin and the victim ended their relationship with acrimony. Linda Lagasse, a friend of the victim, was prepared to testify that she knew Halpin and that he allegedly had beaten the victim and that the victim was fearful of him. In 2000, Lagasse and her fiance, Brian Scott, were friendly with the defendant and the victim and had visited them at their home in Enfield. At that time, Lagasse observed that the victim's pallor was white and that her body was trembling. The victim told Lagasse that she had seen Halpin in Enfield and that she was afraid of him. The victim allegedly told Lagasse that if she were ever to be found choked or strangled, the victim wanted Lagasse to know that Halpin was responsible. Allegedly, Halpin told the victim in the 1980s that it might take five to ten years but that he would strangle her and make it look like someone else had done it.

Scott was expected to testify that he and Halpin were once employed by the Krupa Oil Company. On one occasion, Scott, who was wearing his employer's uniform and operating a truck identified as belonging to the Krupa Oil Company, approached the victim to exchange greetings. The victim walked away from Scott. When Scott caught up to the victim, she apologized for not recognizing him but was afraid he was Halpin. Defense counsel also represented that Halpin lived within one quarter of a mile of the apartment and worked for a

---

[16] The offer of proof also was made after the court had denied the defendant's motion for a judgment of acquittal.

landscaping business that provided services to Carousel Apartments.

The state objected to the proffered evidence, claiming that it did not directly link Halpin to the crime with which the defendant was charged. The state also argued that motive was not enough to raise the alleged evidence above mere suspicion because the alleged threat was remote in time, almost twenty years prior to the victim's death, and the victim's alleged statements to Lagasse were made several years prior to the victim's death. Although the state acknowledged that Halpin's brother is the owner of the landscaping business that provides services for Carousel Apartments, the defendant failed to indicate that he had facts placing Halpin at the scene of the crime on March 29 or 30, 2003. Moreover, the evidence from Lagasse was hearsay.

Defense counsel responded that the victim's statement to Lagasse concerning her fear of Halpin was admissible under the state of mind exception to the hearsay rule. The court questioned defense counsel as to how the victim's state of mind in 2000 was relevant to her state of mind at the time of her death. Defense counsel represented that the victim's state of mind was relevant to demonstrate her fear of Halpin and to establish Halpin's motive to kill her. The defense intended to put Halpin at the scene of the crime by calling him to testify that he had had a relationship with the victim and that he lived near the apartment.[17]

The court granted the motion in limine precluding the defendant from presenting evidence that Halpin was the third party who murdered the victim. The court reasoned that there was no direct evidence linking Halpin to the murder and that it was not enough for the

---

[17] Query why the defense believed that Halpin would willingly testify in the defendant's murder trial if his testimony could possibly implicate him in the murder.

defendant merely to demonstrate motive without more. The evidence the defendant intended to present to link Halpin to the victim's death was twenty year old hearsay[18] that rose only to the level of suspicion. The court concluded that it was remote information about a remote relationship and was therefore irrelevant to whether the defendant was guilty beyond a reasonable doubt of the crime with which he was charged. We agree with the court that the defendant merely proffered evidence that was a suspicion and, therefore, was not relevant.

On appeal, the defendant relies on *State* v. *Crafts*, 226 Conn. 237, 627 A.2d 877 (1993), to support his argument that the victim's state of mind was relevant. We disagree. In *Crafts*, the defendant was charged with murdering his wife while their divorce was pending. Five witnesses, including the wife's coworkers, friends and divorce lawyer, testified that the victim had told them that if anything ever happened to her that they should not assume that it was an accident. Id., 252. Our Supreme Court held that the trial court had not abused its discretion by admitting this evidence because it established the wife's state of mind and was relevant to an issue in the case. The defendant in that case questioned whether his wife was dead and not merely missing or hiding. Id., 254. Evidence of the wife's state of mind "was probative of whether she was likely to leave. From this [hearsay] evidence the jury could have concluded that despite the [wife's] concern for her safety, she intended to remain with her family." Id.

In the present case, the state points out that the defendant claimed that the victim's death was an accident.[19] If Halpin were responsible for the victim's death, however, the death would not have been accidental.

[18] We note that the proposed testimony contained double hearsay. Each layer of hearsay must be admissible on its own ground. See Conn. Code Evid. § 8-7.

[19] The state's theory of the case was that the defendant murdered the victim in such a way as to make it appear as if she had died accidentally

To present evidence of third party culpability, there must be evidence that directly connects the third party to the crime charged. A review of the scope of the rule in cases concerning the admission of third party culpability evidence demonstrates that the trial court in this case did not abuse its discretion when it granted the state's motion in limine. Compare *State* v. *Smith*, supra, 280 Conn. 303 (DNA report highly relevant to defendant's theory of misidentification), and *State* v. *Cerreta*, 260 Conn. 251, 263, 796 A.2d 1176 (2002) (evidence of third party's hair and fingerprints found at crime scene more than bare suspicion), with *State* v. *West*, supra, 274 Conn. 626 (unidentified palm and fingerprints in areas of home where intruder went but no evidence when prints made or by whom), and *State* v. *Boles*, 223 Conn. 535, 549, 613 A.2d 770 (1992) (animosity between third party and victim sheer speculation). Because the defendant failed to present evidence that directly linked Halpin to the murder with which the defendant was charged, the proffered evidence was speculative. It therefore was irrelevant, and the court did not abuse its discretion by excluding it.

C

The defendant's third claim of evidentiary error is that the court improperly permitted the defendant's cellmate to testify as to certain statements the defendant had made implicating himself in the victim's death. The defendant claims the statements were void of probative value but highly prejudicial to him. We are not persuaded.

The following facts are relevant to our resolution of the claim. On June 29, 2005, the defendant filed a motion in limine to preclude the testimony of the state's witness, Charles Mitchell, as being neither material nor

so that he could collect the proceeds of her accidental death life insurance policies.

relevant. The court heard oral argument on the motion just before Mitchell testified. Defense counsel recited a portion of the statement Mitchell gave to police, namely, "[The defendant] also recited a scripture which stated, in part, that murderers and adulterers won't be allowed into the kingdom of heaven, and that's why he wouldn't attend church services." Defense counsel claimed that the statement was more prejudicial than probative because it was likely to inflame the jury, as there was no evidence of adultery. The court denied the motion, concluding that Mitchell's testimony was relevant and that its probative value outweighed its prejudicial effect.

Mitchell testified that he and the defendant shared a cell at MacDougall-Walker Correctional Institution (Walker) while Mitchell was awaiting sentencing.[20] As they got to know one another, the defendant let Mitchell know that the victim's nagging behavior and controlling ways bothered him, but that he loved her and that their problems were normal. Mitchell testified that although prisoners generally do not discuss their cases with one another, the defendant told him that he had been accused of killing his wife. He explained to Mitchell that after he had returned from McDonald's, he and the police discovered the victim, who had fallen down steps, but he learned months later that the victim had been strangled. Mitchell noticed that the defendant displayed no emotion when talking of the victim's death, as if he were reading from a book.

Mitchell was spiritual and attended church services at Walker. He asked the defendant to attend services with him, explaining that it would help with the spiritual aspect of life. When Mitchell asked the defendant why

[20] Mitchell had been convicted of robbery in the first degree and was awaiting sentencing pursuant to a plea agreement that his counsel had negotiated, when he shared a cell with the defendant. At the time he testified, Mitchell had been convicted.

he would not go to church, the defendant responded that "murderers and adulterers can't get into the kingdom of heaven," citing scripture. Mitchell then opened the Bible and showed the defendant a verse stating that all sins can be forgiven. The defendant indicated to Mitchell that he needed to get "something off his chest" and stated that "I'm responsible for [the victim's] death." According to Mitchell, this was the first time he had seen the defendant express any emotion or remorse. Mitchell and the defendant then prayed together. Thereafter, Mitchell felt as if there was a burden on him as he thought of the victim's family. After consulting his attorney, Mitchell went to the police and provided a written statement about the conversations he had had with the defendant.

As we have stated, we review a court's evidentiary rulings under the abuse of discretion standard. See *State v. Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001). Again, the defendant's claim turns on the question of relevance. Section 4-1 of the Connecticut Code of Evidence provides in pertinent part that evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." The offering party has the burden of establishing the relevance of proffered testimony. *State v. Skidd*, 104 Conn. App. 46, 63, 932 A.2d 416 (2007).

A defendant's confession is the most damaging evidence of guilt. See *State v. Patterson*, 276 Conn. 452, 470 n.11, 886 A.2d 777 (2005); *State v. Ruth*, 181 Conn. 187, 199, 435 A.2d 3 (1980); *State v. Vaughn*, 171 Conn. 454, 460, 370 A.2d 1002 (1976). We reject the defendant's claim that Mitchell's testimony was irrelevant and had a tendency to inflame the jury. "While the preliminary question of admissibility of a confession is for the court, the credibility and weight to be accorded the confession is for the jury." *State v. Vaughn*, supra, 460–61. On direct

and cross-examination, Mitchell admitted to being a convicted felon. The defendant was given a full opportunity to cross-examine Mitchell and to bring other evidence to the attention of the jury that might have cast doubt on his testimony. The defendant argues that Mitchell's testimony as to the defendant's statements regarding responsibility were subject to misinterpretation, as the jury could have inferred that the defendant was referring to his failure to retrieve the animal carrier from the basement. Defense counsel, however, did not make that argument to the jury. Because we conclude that Mitchell's testimony was relevant, as it had a tendency to aid the jury, the court properly denied the defendant's motion in limine.[21]

We conclude, therefore, that the defendant has not demonstrated that the court abused its discretion in ruling on any of his evidentiary claims and that he is not entitled to a new trial on that basis.

## II

The defendant also claims that the court's instruction to the jury was improper in two respects. He claims that the court (1) failed to give an instruction pursuant to *State* v. *Patterson,* supra, 276 Conn. 452, and (2) improperly charged the jury as to reasonable doubt. We disagree.

We review claims of instructional error in accordance with the following standard. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The charge must be correct in the law, adapted to the issues and sufficient

---

[21] In his brief to this court, the defendant also argued that there was no evidence to corroborate Mitchell's testimony. He did not state that ground before the trial court, and, thus, the claim is not preserved. See *State* v. *Sawyer,* 74 Conn. App. 743, 757, 813 A.2d 1073 (2003), rev'd on other grounds, 279 Conn. 331, 904 A.2d 101 (2006).

to guide the jury. . . . The primary purpose of the charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established. . . . [A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Although [a] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given . . . [a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance. . . . Thus, when the substance of the requested instructions is fairly and substantially included in the trial court's jury charge, the trial court may properly refuse to give such instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson,* supra, 276 Conn. 466–67.

## A

The defendant claims that the court should have given the jury an instruction pursuant to *Patterson* in light of Mitchell's testimony. We agree with the state that not only is the claim not reviewable but also that a *Patterson* instruction was not warranted given the facts of this case.

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz,* supra, 252 Conn. 561. In this state, until *Patterson,* there were two exceptions to the general rule for complaining witnesses who also could be charged with the crime and as accessories. *State*

v. *Patterson*, supra, 276 Conn. 467. In *Patterson*, the informant testified that he had been convicted of various felony offenses, including larceny, robbery, assault and failure to appear. He also had a long history of using aliases and giving false statements when he was arrested. At the time he testified, the informant was serving a sentence for robbery in the first degree, a narcotics charge was pending against him in Connecticut and several charges were pending against him in New Jersey. Id., 464. Shortly before trial in the *Patterson* case, two police officers approached the informant to inquire whether his cellmate, the *Patterson* defendant, had made any incriminating statements. The informant told the police officers that he would help them only if he was able to benefit from doing so. In consideration of his cooperation, the informant requested and was promised a two year reduction in the sentence he was serving for robbery, a favorable recommendation regarding the disposition of the narcotics charges, help getting early parole, transfer to another prison and restoration of his visitation privileges. Id., 465. The *Patterson* defendant filed a request to charge, asking the court to instruct the jury that in evaluating the informant's testimony, it should consider the benefits he received in exchange for his testimony. Id. The trial court denied the request of the *Patterson* defendant, and he appealed following his conviction.

Our Supreme Court in *Patterson* held that, as in situations in which an accomplice or the complaining witness could have been subject to prosecution for the crime, "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect." Id., 469. "Because the testimony of an informant who expects to receive a benefit from the

state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state"; id., 470; in such circumstances, a defendant is entitled to an instruction that in evaluating a jailhouse informant's credibility, the jury should consider the benefits that the state has promised the informant in exchange for his cooperation. Id., 465, 470.

At the time of the trial in this case, *Patterson* had not yet been decided. At trial, the defendant made no request that the court give a special instruction as to Mitchell's credibility because he was a "jailhouse informant" and may have received favorable treatment in return for his testimony. In December, 2005, our Supreme Court rendered its decision in *Patterson*, while the defendant's appeal was pending. The defendant concedes that he did not preserve the claim at issue but argues that the claim is entitled to review because *Patterson* created a new constitutional right. We disagree. "[A]n instructional error relating to general principles of witness credibility is not constitutional in nature." Id., 471, citing *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997). Furthermore, this court has concluded that the *Patterson* rule should not be applied retroactively when the defendant has not requested the instruction in question. *State* v. *Martinez*, 95 Conn. App. 162, 166 n.3, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006).

Moreover, the facts of this case do not bring it within the ambit of *Patterson*. Mitchell testified that he met the defendant while Mitchell was awaiting the imposition of his sentence for robbery in the first degree. Mitchell testified that his lawyer had negotiated his sentence prior to his talking to the police about the defendant's incriminating statements. The negotiated sentenced was imposed prior to the time Mitchell testified at trial. The defendant produced no evidence to contradict

Mitchell's testimony regarding his sentence. See *State* v. *Munoz*, 233 Conn. 106, 120, 659 A.2d 683 (1995) (whether jury instruction improper gauged by considering entire instruction with reference to facts and evidence in case). Under the circumstances of this case, application of the *Patterson* rule concerning special credibility instructions for a jailhouse informant who receives a benefit from the state in return for his testimony was not warranted. The defendant's claim, therefore, fails.[22]

## B

The defendant's last claim is that the court improperly instructed the jury on the concept of reasonable doubt. The defendant takes exception to the instruction that "reasonable doubt is doubt as jurors would heed in serious affairs, as would cause reasonable people to hesitate to act in important matters; it is real, genuine doubt honestly entertained after fair comparison of the entire evidence." The defendant concedes not only that this claim was not preserved, but also that he requested that the court instruct the jury in "language similar to that given."[23] He seeks review pursuant to the plain error doctrine and *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Even if we were to grant *Golding* review, this claim has been reviewed and rejected by our Supreme Court on numerous occasions. See *State* v. *Colon*, 272 Conn. 106, 234, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005), and cases cited therein. This court is bound by the judgments of our Supreme Court.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[22] The court did instruct the jury that it could consider Mitchell's criminal record when it weighed his credibility.

[23] In his brief, the defendant stated that he raised the claim in this court to preserve it for federal habeas corpus review.